## Commonwealth *against* Miltenberger.

When public officers of a city corporation have located a highway, and fixed the boundaries up to which the owners of property may build, and they have so built and enjoyed their property on both sides of it for more than twenty-one years, and the public highway has been used in that place for the same length of time, it must be considered as the true location, which cannot be disturbed, to the prejudice of vested rights, by the subsequent acts or authority of the city corporation.

Statutes of limitation run not against the public, nor will lapse of time change the nature of a nuisance.

APPEAL from the decision of the district court of *Alleghany* county.

The Commonwealth against George Miltenberger. This was an indictment found in the mayor's court of the city of Pittsburgh, and removed to the district court by virtue of a special act of assembly passed 16th of June 1836. The defendant was charged with erecting and maintaining a nuisance upon Cherry alley, one of the public highways of the city. The questions were, where Cherry alley was, and whether the defendant had built his house upon it. It appeared in evidence that the city of Pittsburgh was surveyed and laid out for the late proprietors in 1784 by Colonel George Woods who was assisted by Thomas Vickroy.

They first surveyed off a certain portion of ground commencing on the Monongahela river opposite the mouth of Grant street; thence down said river to its junction with the Alleghany; thence up the same to where the canal now crosses the river; thence at right angles with the river to Liberty street; thence over Grant's hill to the place of beginning. They thus inclosed, in a trapezium of four unequal sides, the space to be laid out into lots, streets and alleys for a town or city; and, as their map shows, the two rivers formed two of the boundary lines of this trapezium; and Washington street perpendicular to the Alleghany, and Grant street at right angles with the Monongahela, formed the two other boundaries, which included the space appropriated to this purpose.

Having first plotted out the space thus surveyed on paper, and formed the plan which we have before us, called "Wood's plan," they proceeded to locate the lots and streets and alleys on the ground.

[Commonwealth v. Miltenberger.]

This "plan" was always referred to as evidence of boundary and location of the lots and streets of the city. About 1809 it became important to ascertain the exact location of Cherry alley, for the purpose of giving direction to persons disposed to build upon it. The city regulators were then convened, and ascertained its precise location, and regulated the lots preparatory to building upon them. In pursuance of this regulation, houses were built, and among others that of the defendant. Differences of opinion continued to exist respecting the correctness of this regulation; and it was frequently the subject of difficulty in the councils until 1828; when the "city regulators" were again directed to survey and ascertain the location of Cherry alley. This was done and the alley was differently located from what it was in 1809: this last location was adopted by the city councils as the true one, by which the house of the defendant was found to be eleven feet five inches on Cherry alley. It also appeared by the regulation of 1809, there was a surplus of ground which the then regulators apportioned equally between the lots: by the regulation of 1828 there was no such surplus, and the streets and lots were laid down with mathematical precision, according to the principles and plan of the original survey and location in 1784. To settle these conflicting difficulties, an application was made to the legislature of the state, who, by an act passed in 1831, established Grant street and Cherry alley according to "Wood's plan," as ascertained by the regulation of 1809, and abolished the regulation of 1828. This indictment was found in 1832, for the purpose of testing the true location of Cherry alley and the constitutionality of the act of assembly of 1831.

The court below (Grier, President) instructed the jury, that in an indictment for a nuisance, erected or continued in the public highway, no length of possession is a bar or justification to the defendant; but that the principle was not at all applicable to this case: that if in 1809 the constituted authorities of the city made a regulation in conformity to "Wood's plan" as nearly as the same could be ascertained, in accordance and upon the faith of which houses had been built and occupied ever since, it must now be taken to be the true regulation: that the act of 1831, establishing and confirming it, was both constitutional and wise: and that the defendant should be acquitted.

Verdict, not guilty, and that the mayor, aldermen and citizens of Pittsburgh pay the costs.

*Findlay*, for plaintiff in error.
*W. Forward*, for defendant in error.

The opinion of the Court was delivered by

GIBSON, C. J.—Lapse of time will doubtless not change the nature of a nuisance, because statutes of limitations run not against the public; but the question is, whether the erection, which is the sub-

[Commonwealth v. Miltenberger.]

ject of this indictment, was a nuisance in the first instance ; and the principle which rules it lies in a narrow compass.    There is a manifest difference betwixt an encroachment on the actual and recognized boundary of a highway, and the occupancy of ground thrown out of the original survey.    In the Commonwealth *v.* M'Donald, the defendant's house, covering as it did the space betwixt his lot and the river bank so as to leave no passage at all, stood notoriously on what was established by the evidence to be the street ; and his other point failing him—that there had been no valid dedication of the ground to public use, he was necessarily driven to a defence on lapse of time, which was not allowed to serve him.    Long possession may have a powerful influence in fixing the limits of an original or a subsequent location, but it cannot directly control the right.    Had the building in M'Donald's case been erected on ground thrown out of the original survey, he would have had an available defence on original grounds ; and the principle is applicable to every sort of highway.    A public road, under the general law, is opened as near as may be to the diagram returned with the report ; yet seldom so exactly on the designated bed as to prevent a departure from it sufficient to admit of an erection on the deserted ground.    In process of time parts of the bed originally occupied are found to have been badly chosen ; and the practice is to make gradual and successive alterations, till, in the end, there may be a change of nearly the whole route.    A very small portion of any ancient road would be found to lie on its original site ; yet it has not been supposed that the new and dislocated parts do not legitimately belong to it, or that the supervisors would be dispunishable for not keeping them in repair. The public has the enjoyment of its franchise according to its actual occupancy ; and its mutations concern only the owners of the circumjacent soil.    Except as to alterations falling within the maxim *de minimis*, they might, in the first instance, restrain the supervisors to the courses and distances of the survey ; but a departure from them, expressly or tacitly licensed, would raise the implication of a contract obligatory on both sides.    Subject to the same exceptions, on the other hand, ground disused in consequence of the shifting of a route is so far abandoned that it may not be resumed without the owner's consent, and he would therefore not be answerable for a subsequent erection on it.    In many places nothing is more common than to see parts of the highways thrown out and returned to a state of cultivation ; and to allow the public an arbitrary right to resume the occupancy of them would be fraught with injustice.    Thus stands the principle in relation to the general road law ; and the mischief it serves to repress would be more severely felt were it inapplicable to the incorporated towns.    The functions of regulators, within their limited and narrow sphere, are in some respects judicial ; and there would be no security for property were their decisions reversible by their successors.    By their zeal in detecting the errors of their predecessors the houses of a square are sometimes found to

[Commonwealth v. Miltenberger.]

stand a few inches on the street, yet it would not be tolerated were the owners required to readjust their fronts. Having set their buildings to the line then established, there would be no room for complaint ; and if none had been established, the fault would be imputable to the corporation, whose business it was to define the public right, and not to the owners, who were not bound to wait till it should please the authorities to act. No more is to be required than an honest endeavour by the owners to ascertain the bounds of their lots. The sum of the matter is, that subsequent regulation be not allowed to infringe on a building fairly begun. Apply that principle to our case. The lines of the alley were marked at the survey of the plan by locust pins driven into the ground ; and the evidence in relation to such of them as lately remained makes it probable that the defendant's building stands clear of the alley even as it was originally laid ; but as our business is with law and not with facts, we must take it that the jury might have arrived at a different conclusion, and we must consequently lay down a rule for the event. It must be perceived that we consider the location of Grant and Smithfield streets, on which Cherry alley has been supposed to depend, as having, in truth, no bearing on it. What we have to do with is the particular regulation in conformity to which the lot owners erected their buildings. But two regulations have been distinctly mentioned—the first in 1809, the second in 1828 ; for though pins were found in the ground during the execution of the former, they were more probably monuments of the original survey than of an intervening regulation. That however is unimportant, it being decisive that the alley was opened and the lots built upon on the faith of the regulation of 1809, and that the public use conformed to it without a dissenting voice till 1828—a period subsequent to the defendant's building, which was erected in 1814. Such is the undisputed evidence in the cause. What then is the force of subsequent regulation or mensuration according to the general plan, against an intervening right ? When the corporate authorities took possession conformably to boundaries assumed by themselves, they acknowledged an adjoining ownership, which could be divested only in the way known to the constitution. It is an error to suppose that regulators, though competent to measure off the public grounds in the first instance, have jurisdiction in questions of subsequent encroachment : fortunately for the public repose these are to be decided by the constitutional arbiters of public wrongs. On the principle stated, it is unnecessary to scrutinize the indicated parts of the charge, as the conclusion attained by the judge is an impregnable one. Neither is it necessary to pass upon the constitutional validity of the act of 1831, the regulation of 1809 being a sufficient foundation for the defendant's right without it. Finally, the power of the jury to mulct the corporate officers *pro falso clamore* has not been seriously denied ; and we see nothing in the case to call for revision.

Judgment affirmed.