# Chicago, Rock Island and Pacific Railroad Co.

## *v.*

## The City of Joliet.

1. DEDICATION—*difference between a statutory and common law dedication.* The difference between a statutory and common law dedication is, that the one vests the legal title to the ground set apart for public purposes in the municipal corporation, in trust for the public, while the other leaves the legal title in the original owner, charged, however, with the same rights and interests in the public which it would have if the fee was in the corporation.

2. SAME—*how and by whom the use of land dedicated to public use may be directed and controlled.* Where land is described on a recorded plat as "public grounds," it is an unrestricted dedication to the public use. In such case, the use is indefinite, and may vary, according to circumstances. The public not being able, through themselves, to manage it, the care of it must devolve upon some local authority or body corporate, as its guardian, who may direct its use, subject to the control of the law and the courts in case of any abuse of the trust.

3. In such case, as between a municipal corporation holding title to the ground for public uses without restriction, and the general public, the legislature may direct and regulate the purposes for which the public may use it.

4. Where a plat of a town, duly recorded, contained a block marked "public grounds," and there is no incorporation of the town, the power of directing what public use shall be made of such public ground devolves upon the legislature, as the representative of the whole people.

5. Where the legislature authorized the board of directors of a railroad company to locate and construct their road along and across the public grounds and streets of an unincorporated town, and the directors, in pursuance of that authority, did so locate and construct their road, they were, to all intents and purposes, public agents in so doing, and such location was the act of the State, and within the legislative authority, unless such location was inconsistent with the use to which such public grounds had been previously applied by the legislature.

6. The legislature, in creating a new county, provided that the county seat should be located in a town which, at that time, had no incorporation, and also provided that the public buildings of said county should be erected on certain grounds, marked on the recorded plat of said town as "public grounds:" *Held,* that there was nothing in the use to which public ground was thus directed by the legislature, from which the power

79 25 / 31a 286

79 25 / 38a 154

79 25 / 139 310 / 145 464

79 25 / 163 407

79 25 / 164 232 / 66a 567

79 25 / 166 41 / 166 297

79 25 / 169 403 / 169 412 / 72a 595

79 25 / 174 171

79 25 / 177 109

79 25 / 179 101

79 25 / 182 214

79 25 / 193 ⁹190

79 25 / 194 ⁷540

79 25 / 200 ¹516

79 25 / 210 ³327

79 25 / 215 ¹⁰495

of the legislature to locate a railroad over the same grounds should be presumed to be restrained.

7.  Public use. It is a settled doctrine that the appropriation of property to the construction or use of a railroad for the transportation of persons or property, is an application of such property to the use of the public.

8.  Where property is dedicated to the use of the public, generally, and it is for a long time and with universal acquiescence used for the public purpose of a railroad, this affords evidence that such use is consistent with the design of the dedication.

9.  Estoppel—*when applicable to municipal corporations.* Whilst municipal corporations are not, as respects public rights, within ordinary limitation statutes, still, the principle of an *estoppel in pais* is applicable in such cases, as this leaves the court to decide the question, not by mere lapse of time, but by all the circumstances of the case, and to hold the public estopped or not, as right and justice may require.

10.  The right of way over certain public grounds, in an unincorporated town, was granted by the county authorities to a railroad company, and the company constructed its road over such grounds, and the town, after it became incorporated, upon the petition of the company, vacated certain alleys and authorized the use of certain streets for the use of the railroad company, to enable it to build a depot upon certain ground, which could only be reached by continuing the use of the track over such public grounds. The town authorities also assessed local taxes against these public grounds, as the property of the county, for a number of years. And the railroad company, with the knowledge of the town, in pursuance of its agreement made with the county when the right of way was granted, made its proportion of certain improvements upon the public grounds, amounting to over $4000. The right of the railroad company was never questioned by the town until nearly twenty years after the company commenced using the right of way: *Held,* that the town was estopped to deny the right of the railroad company to use the right of way over the public grounds.

11.  Municipal corporations—*power to declare what is a nuisance.* A municipal corporation, in the absence of any general laws, either of the city or State, within which a given structure can be shown to be a nuisance, can not, by its mere declaration that it is one, subject it to be removed by any person supposed to be aggrieved, or even by the city itself.

12.  Same—*construction of city ordinance.* A proviso, in a city ordinance granting certain privileges to a railroad company, that such railroad company should be subject to all laws and ordinances that might thereafter be passed to regulate railroads in the city, only means that the railroad company shall be subject to all reasonable and legal ordinances

for the regulation of the road. It has no such scope that the railroad company should abandon or take up and remove its track at the bidding of the common council.

Appeal from the Circuit Court of Will county; the Hon. Josiah McRoberts, Judge, presiding.

On the 10th day of June, 1834, James B. Campbell laid out the town of Juliet, upon land then situate in the county of Cook. A plat thereof was made and recorded. There was a block of land on the plat marked "public ground."

On the 16th of February, 1835, A. W. Bowen laid out the adjoining town of East Juliet. A plat thereof was made and recorded. On this plat there was also a space marked "public ground." In fact, these parcels in the two plats marked "public ground" were side by side, separated only by Chicago street.

January 12, 1836, the "Act to establish the county of Will" became a law. By its second section it provided :

"Sec. 2. The permanent seat of justice of said county shall be at the village of Juliet, and the public buildings thereof shall be erected on the public square, recorded in the plat of said town as public ground, and adjoining to section fifteen."

March 1, 1837, the town of Juliet was incorporated. The act authorized the corporation "to enjoy all the rights and privileges which are conferred upon towns incorporated under the act entitled 'An act to incorporate the inhabitants of such towns as may wish to be incorporated,' approved February 12, 1831." Neither of these acts conferred upon the trustees of the town any control over public grounds, other than public streets and highways; and the one last mentioned provided, that, upon the dissolution of any town corporation, "all persons having funds belonging to such corporation in their hands, shall pay the same into the county treasury; and all bonds and securities taken for the same by such corporation, shall vest in the county commissioners, for the use of such county."

January 27, 1841, the act incorporating the town of Juliet, above mentioned, was repealed, and the then existing board of trustees were "authorized to settle all the accounts, debts or demands, either in favor of or against the corporation of the said town of Juliet." It further declared, that, "for this purpose and no other, they shall be capable of suing and being sued, as under the provisions of the act hereby repealed."

February 26, 1845, the name of the town "Juliet" was changed to "Joliet," and it was declared that the additions to said town should thereafter be designated as "additions to Joliet."

In 1846 and 1847, the present court house of Will county was erected by the authorities of the county on that part of the "public ground" which was embraced in the plat made by Campbell. Previous to that time, the court house stood on that part of the "public ground" embraced in Bowen's plat, being that portion east of Chicago street.

On the 27th day of February, 1847, the legislature created the Rock Island and LaSalle Railroad Company, with powers, among others, to construct a railroad from Rock Island to the Illinois river, "and to locate and construct the same on such line, course or way as may be designated or selected by the directors of said corporation, whereon to construct and make the same." February 7, 1851, the company were authorized to construct their projected railroad from its then present termination, *by way of Ottawa and Joliet,* to the city of Chicago, under the same powers and privileges as above. By the same act, the name of the company was changed to "The Chicago and Rock Island Railroad Company."

In the spring and summer of 1851, the line of the road was established by the directors of the company through the town of Joliet, and thence to Chicago.

In compliance with the popular wish, the line was located across this "public ground," and within about twenty feet of the court house.

Afterward, November 6, 1851, the company submitted to

the board of supervisors of Will county a petition, asking a grant of the right of way for the construction of the Chicago and Rock Island Railroad, as then located by the company "over the public square in Joliet, in said county."

The petition was granted, and on the 8th day of November, 1851, the company and the board, by its chairman, entered into a formal written agreement, whereby the right of way across the public square was granted, upon certain terms and conditions, one of which being, that the company should inclose a portion of the public square with a good and suitable fence, to correspond with such as the people of the county might inclose the remaining part of the public square with.

The work of constructing the road in the city was commenced in the winter and spring of 1852. The first regular train arrived and passed over the "public ground" July 4, 1852. At this time, the "public ground" was open and unfenced, and never had been fenced. The principal business of the town was from two to six blocks north and north-west from the railroad.

On the 22d of June, 1852, the city of Joliet was incorporated, and on the 7th of August, 1852, the city government was organized.

Reference has before been made to the act incorporating the town of Juliet, in 1837, and its repeal in 1841. From the date of this repeal until the incorporation of the city, this community did not have any municipal organization.

At a meeting of the city council of the city of Joliet, held on the 3d day of January, 1853, the Chicago and Rock Island Railroad Company presented a petition, asking "for certain privileges, *in order that they may locate their depot in the city of Joliet, on a part* of blocks 2, 3, 19 and 20, in school section to Joliet." The record of the city council recites, that an "ordinance was adopted in accordance with this petition." Then follows the ordinance, which vacates certain alleys and parts of alleys, and authorizes the use by the company of portions of certain streets, for railroad purposes. It appears,

that these privileges were available to the company only with the use of its right of way over the "public ground."

In September, 1863, the board of supervisors of Will county set about the building of an iron fence, with a stone foundation, around the public square, and notified the railroad company to build their portion of it, which they had agreed to build in consideration of the grant to them, in November, 1851, by the board of supervisors of Will county, of the right of way across the square. The company. afterward, in the fall of 1863, built their portion of the fence, to the satisfaction of the board of supervisors. Their whole expenditure about the square, including the cattle-guards, which they had also agreed to build, and filling in with earth a portion of the square, at the request of the board of supervisors, amounted to $4160.91.

On the 20th of August, 1866, the Chicago and Rock Island Railroad Company consolidated its property and franchises with those of the Chicago, Rock Island and Pacific Railroad Company, of Iowa, under the name of the latter.

From 1854 until about a year before the commencement of this suit, the city of Joliet levied special taxes for local improvements upon this "public ground," as the property of the county, and these taxes were paid by the county.

In September, 1872, the city council passed an ordinance declaring the occupation of the public square and the operation of the railroad where its track crosses Chicago street, and on and along the curved line between Chicago and Scott streets, "shall be deemed and taken as a public nuisance," and prohibiting such use and imposing penalties therefor.

On the 1st of November, 1872, the city of Joliet filed this bill. In the original bill, the board of supervisors was joined as a party complainant. On the 25th of January, 1873, the amended bill was filed, alleging that the action of the city in so joining the board had been repudiated by that body, and making said board a party defendant.

In this amended bill it is substantially alleged, that the

company located and constructed its railway across the "public ground" mentioned, without any sufficient authority ; that by reason of the noise and confusion produced by the running of trains over the public grounds, the public business of the courts in the court house is very greatly disturbed and interrupted ; that though the operation of the railroad was for some years the cause of but little annoyance, because of the sparseness of the population and the unimproved condition of the property along the line, it has now, by reason of the growth of that portion of the town, the erection of buildings near the track, and the increase of business generally near the road, become highly dangerous to persons and property ; that it has thus become a public nuisance ; that complainant had passed an ordinance declaring it such, and prohibiting the running of trains thereon ; that the ordinance had been disregarded.

The prayer is for a decree restraining the operation of the railroad over the "public ground" and over its crossings of certain streets.

The company answered, setting up its rights under its charters ; the grant of the right of way over the "public grounds" by the board of supervisors ; the action of the city after it became incorporated, vacating alleys and granting special privileges in the streets, for the purpose of enabling the company to build its depot in close proximity to said "grounds," its continuous possession and enjoyment for more than twenty years, an estoppel *in pais,* right by prescription, and the Statute of Limitations ; and denying that the grounds were ever dedicated to the public use as public grounds of the city of Joliet.

The board of supervisors answered, alleging that the county buildings were erected on these public grounds more than thirty years prior to the filing of the bill, by legislative authority ; that the grounds had always been used and enjoyed by the county of Will, as the owner thereof ; that they had never been claimed or treated as the property of the city of

Joliet; that the latter had never had control of the same; that it had always assessed against the county, as the owner of the ground, special taxes for the improvement of streets and sidewalks adjacent thereto; denies that they were ever dedicated to the public use as public grounds of the city of Joliet, and admits that the board did grant the right of way to the railroad company. Replication was filed, proofs taken. and, on hearing, the circuit court decreed that the railroad company be enjoined from further running engines or cars over or along said public grounds, and the crossings of Chicago street, Jefferson street and Scott street, at their present places of crossing.

From this decree the railroad company appeals.

Mr. Thomas F. Witherow, Messrs. Goodspeed & Snapp, and Mr. George S. Eldridge, for the appellant.

Mr. G. D. A. Parks, Mr. Benjamin Olin, and Messrs. Randall & Fuller, for the appellee.

Mr. Justice Sheldon delivered the opinion of the Court:

A question is raised as to the effect of the plat of Juliet made by Jas. B. Campbell; that, as recorded, it does not appear to have been acknowleged in conformity with the statute, and therefore did not vest the fee of the streets, and what is marked "public ground," in the town or city, as the statute declares that a plat made out, certified, acknowledged and recorded as required by its provisions, shall do. An attempt was made, by parol evidence, to supply the apparent alleged defect.

We shall not stop to discuss the sufficiency of this evidence to the end proposed, as the conclusion which we reach in nowise depends upon whether there was or not such a statutory dedication as to vest the fee in the streets and "public ground" in the town or city. It must be admitted that there was here a common law dedication. The difference between a statutory and common law dedication is, that the

one vests the legal title to the ground set apart for public purposes in the municipal corporation, in trust for the public, while the other leaves the legal title in the original owner, charged, however, with the same rights and interests in the public which it would have if the fee was in the corporation.

The rights of the public are not affected by the question. *Manly* v. *Gibson*, 13 Ill. 308. We will proceed, then, on the assumption that there was a statutory dedication of the "public ground."

The only dedication of the property being, as "public ground," it is an *unrestricted* dedication to public use. In such case, the use is indefinite, and may vary according to circumstances. The public not being able themselves to manage it, the care of it must devolve upon some local authority or body corporate, as its guardian, who may direct its use, subject to the control of the law and the courts, in case of any abuse of the trust. *Commonwealth* v. *Alburger*, 1 Whart. 485.

In 1836, when the county of Will was established, and its public buildings required to be built on the public square by legislative enactment; in 1846 and 1847, when the present court house was built thereon; in 1847, when the railroad company was authorized to construct its railroad, *by way of Ottawa and Joliet*, to the city of Chicago; in 1851, when the line of the road was established by the directors of the company through the town of Joliet, and when the county authorities granted to the company the right of way over the public square in Joliet, and in 1852, when the work of the construction of the road in the city was completed, there was, as will be seen by the statement of the case, no incorporation of the town of Juliet, or of the city of Joliet, and, at all those times, this community had no municipal organization or municipal authority.

There was, then, at these times no power authorized to represent the public, and to direct the public use which should be made of these streets and public grounds in Joliet,

3—79th Ill.

except the legislature of the State, and under it, the county of Will. That such power was vested in the legislature, must, we think, be conceded. Dillon, in his work on Municipal Corporations, section 513, thus lays down the doctrine: "As between the municipality and the general public, the legislative power is supreme ; and so it is in all cases where there are no private rights involved. If the municipal corporation holds the full title to the ground for public uses, without restriction, the legislature may doubtless direct and regulate the purposes for which the public may use it."

In *The People* v. *Kerr*, 27 N. Y. 213, the power was asserted on the part of the State legislature, without the consent or license of the municipal corporation, to so control the use of the public streets of the city, the fee whereof was in the city, as to authorize the construction of a railroad track therein; and this upon the principle that the interest in the streets being *publici juris,* the power of governing and regulating such uses is vested in the legislature, as the representative of the whole people; that the city corporation, as holder of the fee of the streets, in trust for the public, as highways, was but an agent of the State, and any control which it exercised over them was a mere police or governmental power, delegated by the State, and subject to its control and direction.

The legislature, here, acted upon the theory of its power to control the public square and the streets for the public benefit. It ordered, by the act establishing the county of Will, that the public buildings should be erected upon the land marked "public ground ;" in 1849, a portion of Joliet street was vacated by legislative enactment; in 1851, the legislature detached a portion of Oneida street, and granted it to the abutting property owners, in payment for labor done on the highways, and, in the same year, vacated a portion of Michigan street, and the power to determine whether or not sidewalks should be built upon certain streets, was granted by express legislative enactment.

The legislature conferred upon the board of directors of the railroad company the power to locate and construct its railroad on such line, course or way as should be designated by it. provided that it should be through the towns of Ottawa and Joliet, to the city of Chicago.

In the exercise of this power. the board of directors located the road through the town of Joliet, and across these public grounds, which, as above attempted to be shown, were then under the control of the legislature. The board of directors. in the location of this line. exercised the authority conferred by the legislature. and were, to all intents and purposes, public agents in so doing.

The terms of the grant of the authority were certainly broad enough to include the power to locate the railroad over this "public ground;" and such location of the road was the act of the State, by its agents, unless there was that in the use to which the "public ground" had been dedicated, and applied previously by the legislature, and the extent to which that use would be impaired or diminished by the location and operation of the railroad over the ground, from which the power of locating the road over it may be presumed to have been restrained by the legislature.   *Boston Water Power Co.* v. *Boston and Worcester Railroad Co.* 23 Pick. 360; *Indiana Central Railroad Co.* v. *The State of Indiana, etc.* 3 Ind. 421.

That it was deemed that the use to which the "public ground" had been applied by the legislature, that of a court house, would not be too seriously interfered with by the location and operation of a railroad over the ground, is evidenced by the desire of the citizens to have the road located there; by the county authorities, who had the care and custody of the court house, granting to the company the right of way over the ground; by their calling upon the company, in 1863, to perform the consideration of the grant of the right of way, after the road had been in operation ever since the summer of 1852, and the experiencing of its actual effects for that length of time, and by the operation of the road for more

than 20 years by the company, without objection from any quarter, so far as the record shows.

Can it be said that there was a diversion of the use of the ground to another use, inconsistent with the purpose for which it was dedicated?

The dedication, as observed, was not to any specific public use. It was dedicated to no other use than was indicated by the mark upon it, on the plat, of "public ground."

The dedication was merely to public use. It is assumed, on the part of the appellee, that there was here an encroachment upon public grounds for private purposes—an application of public grounds to private uses.

But it is the settled doctrine that the appropriation of property to the construction or use of a railway for the transportation of persons or property, is an application of such property to the use of the public. *The People* v. *Kerr*, 28 N. Y. 188; *Noll* v. *The Dubuque, Burlington and Missouri River Railroad Co.* 32 Iowa, 68.

The right to take private property for railroad purposes, by the exercise of the power of eminent domain, rests wholly upon the doctrine that the railroad use is a public use, it being well settled that the legislature has no power to take the property of the citizen for any other than a public use. The corporation itself is private—has its private rights; still its uses are public.

The railroad use, then, is not a private use, but a use for a public purpose, the use of the road being free and common to the whole public upon the same conditions. The dedication was simply as "public ground," denoting that it was for a public purpose, and the long and universal acquiescence in the use of the ground for the public purpose of a railroad, affords evidence that such use is in consistency with the design of the dedication.

The legislature, in 1836, in establishing Will county, assuming that it had control of these "public grounds," and the power to direct the public use to which they should be

applied, required that the public buildings of the county should be erected thereon.   The court house and jail were accordingly so erected, and the board of supervisors of the county having, by statute, the care and custody of the court house, the railroad company, in November, 1852, before the road was constructed, obtained from the board of supervisors, as the representative of the county, a formal grant of the right of way over the ground, in consideration of certain conditions to be thereafter performed.   This grant, singly, is not so important as affecting the right of appellant.   Its more important bearing is, as taken in connection with the after action of the city of Joliet.

It is not necessary to rest the right of the railroad company upon the statute under which the road was located and the grant of the right of way by the county.

The validity of these grants, and the rights of the railroad company under them, have, as we regard the evidence, been recognized by the express action of the city of Joliet for a period of over 20 years.

The evidence shows that the company, in 1852, preferred another and more direct line.   The person who had the general charge of the building of the road, and who was a director and vice president of the company, testifies that, at a public meeting of the citizens of Joliet, in the court house (he thinks), he made a speech, and remonstrated against running the railroad through the court house square; pointed out the annoyance and inconvenience that would arise therefrom; but the popular demand for the track and depot where they now are, overbore all opposition, and, as the agent of the company, he yielded to the demand of the citizens, much against his own judgment.   All the directors but one preferred a different line, and the testimony of the witness shows satisfactorily that, but for this popular demand, the road would have been located elsewhere.

This is referred to, not to show that any right was given by such an assemblage of citizens, or by the "popular de-

mand," but as a circumstance, to be considered among others, as bearing upon the question of an equitable estoppel.

On the 3d day of January, 1853, within six months after the first train of cars ran over the public grounds, the common council of the city of Joliet, in answer to a petition of the railroad company for certain privileges in order that they might locate their depot on certain named blocks in proximity to these grounds, passed an ordinance whereby they vacated certain alleys and parts of alleys, and authorized the use of certain streets, among which was the use of so much of Ottawa street "as is occupied by the bed and tracks of said railroad company for the purpose of running cars and locomotives over the same."

Ottawa street bounds the "public grounds" upon one side, and lies between them and the ground upon which the depot was proposed to be, and was established, and now stands. This grant of privileges from the city could not have been made available by the railroad company without continuing the operation of its trains over these public grounds. In the language of the testimony, "the present depot of the company could not be made use of without the track running across the public square, as it now does."

Here was not only recognition, on the part of the common council, that the company had a valid grant of the right of way over these grounds, and confirmation thereof, but there was express grant by ordinance of aid and conveniences in order to the future permanent and more full enjoyment of the right of way which had been granted to the company over this "public ground."

When the county authorities, in 1863, moved to have the railroad company perform the consideration for the grant of the right of way by fencing part of the public square, they (the county authorities,) did so, as the evidence goes to show, with the knowledge of the city authorities, and their encouragement thereto. In the construction, afterward, of its share

of the improvement of the public square, the company expended some $4000.

The evidence shows that, commencing in 1854 or 1855, and terminating just prior to the commencement of this suit, the city of Joliet assessed local taxes against these "public grounds," as the property of Will county, and that those assessments were uniformly paid by the county. The levying of local taxes under the ordinances of the city, was, in effect, a declaration upon the part of the city that the county was the owner of this property; an admission that it had the dominion over it, and the right of directing its use, and consequently a virtual assent to and confirmation of the grant of the right of way over the same, which it had made to the railroad company.

From all these positive acts of recognition on the part of the city of Joliet of the right claimed by the railroad company, and long acquiescence in its exercise, there must be held to be an estoppel *in pais* against the city, if that principle be applicable at all to municipal corporations, as respects public rights.

There is a conflict among the authorities whether the rights of a municipality or of the public may be lost by non-user, or adverse possession. There are cases which hold that the public may lose their right to streets or public places by long continued adverse occupation by private individuals. A number of them may be found collected in the note to section 529, in the work of Dillon, before quoted. Upon a review of the cases upon this subject, that author, in section 533. states, as his conclusion, that he "can not assent to the doctrine that, as respects public rights, municipal corporations are within ordinary limitation statutes. * * * But there is no danger in recognizing the principle of an *estoppel in pais* as applicable to such cases, as this leaves the courts to decide the question, not by the mere lapse of time, but by all the circumstances of the case, to hold the public estopped or not, as right and justice may require."

In *The City of Peoria* v. *Johnston*, 56 Ill. 51, this court held the following language upon this subject, in respect to the claim of a highway: "But, independently of this principle, conceding this highway was laid out as claimed by appellant, and conceding there was an intention to dedicate the premises on the south-east of section 4, we are of opinion that the adverse possession of the appellee, open and exclusive as it has been, and the complete non-user of the easement by the public for more than twenty years, are a sufficient answer to the claim now made by the city." We would not be understood, in making this citation, as sanctioning the language thus used in the full breadth, that, in such case, the mere non-user of the easement by the public for more than twenty years would bar the claim, but the reference is made as having pertinence here, under the facts of this case.

In *Goodwin* v. *The City of Milwaukee*, 24 Wis., it was distinctly held that the doctrine of estoppel *in pais* was applicable to a municipal corporation in respect of a matter of public right; and see, as to recognition of the doctrine, *Peck* v. *Burr*, 10 N. Y. 294, *Lane* v. *Kennedy*, 13 Ohio St. 42, *Commonwealth* v. *Miltenberger*, 7 Watts, 450; and, as to delay, in an application of this character, as affecting those who assert a public right, *Easton & McMahon* v. *N. Y. and L. B. Railroad Co.* 24 N. J. Eq. 50, *The Attorney General* v. *Sheffield Gas Consumers' Co.* 3 De Gex, M. &. Y. 312.

We think there is sufficient warrant of authority for the application of the principle of an equitable estoppel to a case of the character disclosed by this record, and that it should be applied here.

The objection taken by appellee's counsel, that there is here lacking an essential element of an estoppel *in pais*, in that it does not appear that the railroad company did, or forbore to do, any thing, by reason of the conduct of the city, we do not regard as founded in fact.

By the action of the city, the company had the right to repose, in security, upon the belief that it had acquired a

valid right of way over the public grounds, and that it would ever be suffered to enjoy the same undisturbed in the right by any interference against it on the part of the city. By the ordinance of the common council, before referred to, of January 3, 1853, the company was encouraged to build its depôt where it did, and where it could not be made use of without the track of the road running across the public square. The road had then but just gone into operation, and had the city, at that time, instead of recognizing the company's right of way over the public grounds, and granting increased facilities for the exercise of it, denied the right, or made objection to its exercise, the company might have then changed its line to the one it had originally preferred, at little cost for the right of way, the evidence being that it would then have been cheap. But the testimony is, that the change of the line would be at the cost, now, of $100,000 for the right of way; that it would involve a further expenditure of some $250,000 on the new portion of the line, much of which we can see would be in consequence of circumstances intervening since January 3, 1853; and that a loss of about $130,000 would be incurred by abandoning the property which now constitutes a part of the road. The payment by the company, in 1863, of the consideration for the grant of the right of way across the public grounds by the building of a fence around a portion thereof, appears to have been done with the knowledge and encouragement of the city authorities.

There was quite enough in the respect of being induced by the conduct of the city to take or forbear action, upon which to found an estoppel.

As respects the question of nuisance, there is no doubt that the running of engines and trains across the public square causes a considerable interruption in the transaction of court business in the court house. But in respect of this, the city does not seem to be the proper party entitled to make complaint. The providing of conveniences for the holding of courts is an affair of the county, and not of the city. The

board of supervisors of the county have the care and custody of the court house. They have granted the privilege to lay this track and operate the road across the public square, and as long as the county is content, and makes no complaint, we do not think the city should be admitted to interfere on this score.

The evidence shows that the operation of the railroad over the crossings of Chicago, Jefferson and Scott streets has been attended with a good deal of injury to persons and property. There have been several instances of the loss of life. The track, at these places, runs upon a curve, and the adjoining lots having been built upon by their owners to within a few feet of the streets, passers upon the streets are so prevented from seeing approaching trains, as to render the operation of the road there peculiarly dangerous from that cause.

The legislature authorized the construction of this railroad through Joliet. It acted with knowledge that its operation over and across common streets and highways would subject the public to inconvenience and danger. It was said, in *Illinois Central Railroad Co.* v. *Grabill*, 50 Ill. 244, that "such consequences of the construction and use of railroads must be borne by all living near them, without complaint, and without hope of redress, for they are inseparable from the purposes and objects of such structures." The necessarily injurious consequences attending the operation of railroads are largely increased in degree, where they run through towns and cities. But to set against this, there is the public accommodation.

The exclusion of railroads from cities would be a most serious public inconvenience. It is the practice of the law-making power to expressly authorize railroad companies to lay and use their tracks through cities and villages. Railroads are, in fact, now operated through the principal cities of this and other States.

It was held, in the case of *Drake* v. *The Hudson River Railroad Co.* 7 Barb. 508, that a railroad, passing through streets

in the city of New York, when the cars were drawn by steam power, into a crowded part of the city, was not, *per se*, a nuisance.

Similar decisions have been made in other cases. *The Lexington and Ohio Railroad Co.* v. *Applegate*, 8 Dana, 289 ; *Hunter* v. *Long Island Railroad Co.* 13 Barb. 646 ; *Moses* v. *P., Ft. W. and C. R. Co.* 21 Ill. 516.

In *Murphy* v. *City of Chicago*, 29 Ill. 279, it was held to be a legitimate use of a street or highway, to allow a railroad track to be laid in it.

The evidence shows nothing as to whether or not, in the case of the accidents which had occurred at these crossings, there was the use of proper care and caution on the part of the persons who suffered injury. The evidence goes to show that much of the exposure to danger at these places is in consequence of the recklessness and gross negligence of persons in disregarding plain warnings of danger. Protection against the consequences of recklessness and gross negligence, no one has the right to expect or call for. The increased danger at these places, from the curve in the track and the private buildings which have been erected, calls for increased carefulness and diligence. It would seem that such increase of danger might, in most part, if not wholly, be guarded against by the increase of safeguards against it. Indeed, it appears, from the evidence, that a flagman has been appointed and kept stationed there by the railroad company, since when, three years ago, there has been no loss of life there. It is competent for the city, in the exercise of its police powers, to make reasonable regulations of railway operations within the limits of the city. It is believed that, through such proper regulations as it. is within the competency of the city council to make, and the use of proper care and precaution, the danger here may be so guarded against, that the operation of the railroad can be rendered reasonably safe to the public; that in this way, to a reasonable degree, the evils complained of

are remediable, and that the intervention of a court of equity is not called for.

As to the ordinance of the common council of the city of Joliet, of September, 1872, declaring the railroad a nuisance, we regard that as without effect upon the case, although the charter of the city confers upon the common council the power to abate and remove nuisances, and to punish the authors thereof, and to define and declare what shall be deemed nuisances.   We will, in this respect, but refer to the language of the Supreme Court of the United States in *Yates* v. *Milwaukee*, 10 Wall. 505:   " It is a doctrine not to be tolerated in this country, that a municipal corporation, without any general laws, either of the city or the State, within which a given structure can be shown to be a nuisance, can, by its mere declaration that it is one, subject it to removal by any person supposed to be aggrieved, or even by the city itself. This would place every house, every business, and all the property of the city, at the uncontrolled will of the temporary local authorities."   And see *State* v. *Jersey City*, 5 Dutch. 170.

Some stress is laid upon a certain proviso in the ordinance of the common council, of January 3, 1853, before referred to, which is as follows:   "*Provided*, that said railroad company shall be subject to all laws and ordinances that may hereafter be passed to regulate railroads in the city."   That only means, that the company should be subject to all reasonable and legal ordinances for the *regulation* of the road.   It had no such scope, that the railroad company should abandon or take up and remove its track at the bidding of the common council.

We are of opinion that there was error in decreeing against the defendant, and the decree will be reversed and the cause remanded, with directions to the court below to dismiss the bill at the costs of the appellee.

*Decree reversed.*