(*Circuit Court of Cook County.*)

### Havemayer, et al.

### vs.

### Bordeaux Co., et al.

(March 19, 1894.)

1. CORPORATIONS—PREFERRED STOCK, RIGHT OF AN ILLINOIS CORPORATION TO ISSUE. A corporation can issue preferred stock when authorized by its charter, or by statute, or if all stockholders give their consent thereto.

2. SAME—ESTOPPEL TO QUESTION VALIDITY OF PREFERRED STOCK. Even in the absence of power to issue preferred stock a corporation may be estopped from avoiding its preferred stock where all the stockholders consented to the issuance thereof, and where the claim of the corporation is inequitable.

3. SAME—RIGHT TO DEAL IN THEIR OWN STOCK. A corporation may deal in its own stock at least to the extent of receiving payment, or to secure a debt due to the company, but the purchase by the directors of the company's stock will be upheld as within their power, if not fraudulent. Generally it will not be upheld, if in violation of the rights of creditors.

4. CORPORATE STOCK—RIGHT OF PLEDGEES OF CORPORATE STOCK TO VOTE SAME, OR TO NOTICE OF ACTS OF DIRECTORS. Pledgees do not stand in the place of the owners of stock, as they are not liable as stockholders, have no right to vote the stock, and are not entitled to any notice of the acts of the directors.

5. FORECLOSURE PROCEEDINGS—SOLICITOR'S FEE, REASONABLENESS OF. A fee of fifteen hundred dollars to complainants' solicitor for foreclosure of the mortgage is reasonable, considering the amount and nature of the services rendered and necessary to be rendered to final decree.

Circuit court of Cook county. Foreclosure bill filed by bondholders and trustee, to foreclose the property of the corporation. Intervening petition by stockholder, making the same defense as the company. Exceptions to master's report overruled. Order for decree. Heard before Judge Thomas G. Windes.

## STATEMENT OF FACTS.

Prior to July 24, 1890, one Edward O. Russell was the owner of a ground lease for a term of 198 years from May 1, 1890, of the real estate described in the bill and known as Nos. 339 and 341 Michigan avenue, Chicago, the rent thereon being payable yearly. Said Russell, Charles E. Rand and Hulburd Dunlevy some time prior to July 24, 1890, organized the Bordeaux Company, an Illinois corporation, for the purpose of carrying on a hotel business on said premises, subscribed for all the stock of said corporation, consisting of 1,000 shares of the par value of $100 each, the said Russell taking 998 shares and said Rand and Dunlevy one share each. The said subscribers for stock were also the first board of directors of said company.

At the first meeting of directors held July 24, 1890, at which all the stockholders were present, said Russell was elected president and treasurer and said Rand secretary of the company; by-laws were adopted, an assessment of 100 per cent upon all stock was levied, and it was resolved to issue $25,000 of the company's stock as preferred stock on the terms set out in the master's report. At the same meeting it was also resolved to purchase said leasehold from said Russell for $25,000 cash, or, if Russell would accept it, the treasurer was authorized to issue said preferred stock in payment for said lease. At a subsequent meeting held on September 27, 1890, at which all the directors and stockholders were present, the action of July 24 in regard to preferred stock was rescinded, and the same amount of stock was made preferred stock and entitled to eight per cent cumulative dividends after May 1, 1891, over all other stock, and also to pay-

ment in full at par in case of a sale of the company's property, and also to share ratably with the common stock in any excess, above par value of all the stock, which might be realized by sale.

The resolution for the purchase of the lease was also reaffirmed, and Russell was empowered to erect a building on said leased premises at a cost of $108,000 to be paid as follows: $33,000 in first mortgage bonds of the company, $74,-800 in the common stock of the Bordeaux Company and $200 in cash. The first mortgage bonds were secured by trust deed to John R. Walsh and became due on the first day of July, 1910, and bore interest at the rate of $6\frac{1}{4}$ per cent per annum, and payable semi-annually, as evidenced by coupons thereto attached, and provided, among other things, that in case of default for thirty days in payment of any installments of interest the whole of the principal secured by said bonds might be declared due and payable. This action in making said stock preferred and in the purchase of said lease was assented to in writing by all of the then stockholders in said corporation.

. The preferred stock was issued to Russell and he proceeded with the erection of a building upon said premises which was intended for a hotel, and completed it in August, 1891. Russell received from time to time after the 27th of September, 1890, and in pursuance of the terms of his contract with said company, said first mortgage bonds and the common stock contracted for by him. Portions of the building were rented and the company continued business with the original directors until July 8, 1892, when said Rand and Dunlevy resigned and John A. Ryerson and Edward Peters were elected directors in their stead. July 8, 1892, the company had contracted a floating indetedness of about $24,000, besides its said first mortgage bonds; and while its assets at a fair valuation exceeded its liabilities by about $82,000, the affairs of the company were in a critical condition and its insolvency was imminent, it was still a going concern, and, before the law, solvent.

At this date, and in order to make provision for said float-
ing indebtedness, to reduce the charges on the company's net
earnings and profits and for putting improvements upon and
furnishing parts of the company's building to the extent of
$3,500, the directors on behalf of the company, the holders
of the preferred stock and John A. Ryerson as trustee, en-
tered into an agreement by which the company agreed to ex-
change said preferred stock at $109.33 per share for an equal
amount in par value of seven per cent second mortgage bonds
of the company, and the holders of said preferred stock
agreed to surrender said stock to the company and accept said
bonds and also to furnish the money to pay said floating in-
debtedness, and to make said improvements, and to furnish
parts of said building not to exceed $3,500, and also to pay
the expenses and attorney's fees incurred in negotiating and
carrying into effect said contract.

Pursuant to and in compliance with terms of said agree-
ment said company executed and delivered to said Ryerson,
as trustee, its seven per cent second mortgage bonds to the
amount of $57,000 becoming due on or before July 1, 1897,
and bearing interest at the rate of seven per cent per annum,
payable monthly, the principal and interest to be payable
in gold, and to secure said bonds and interest the company
executed and delivered to said Ryerson its trust deed of the
same date as said bonds, by which was conveyed to said Ryer-
son, as trustee, all the property of said company of every
kind.

This trust deed, among other things, provides that said in-
terest should be paid promptly when the same became due ac-
cording to the provisions of said bonds and trust deed, and
that the company should deliver to said trustee on or before
the 10th day of each month, beginning with the month of
August, 1892, and continuing during the life of said trust
deed, a statement in writing, over the signature of the presi-
dent of said company, showing in detail the receipts and dis-
bursements of the company received and paid out during the
preceding month, and also showing in detail the indebtedness

of the company exclusive of bonded indebtedness as it stood on the first day of the preceding month, and also that if any default whatever should be made in any of the covenants or agreements and provisions in said deed, and if such default should continue for 30 days after the same occurred, then at the option of the holder of any of said bonds after the expiration of 30 days, without notice to said company or its successors or assigns, might declare the whole of said indebtedness due and payable, and file a bill to foreclose said trust deed in any court having competent jurisdiction, and out of the proceeds of any such sale there should be paid reasonable attorney's fees for the complainants in such suit.

It will be noted that John A. Ryerson, who was one of the directors of the company, was also one of the holders of the preferred stock, the trustee in said trust deed, and was charged with carrying out the provisions of said agreement between the company, the holders of preferred stock and himself as trustee.

Further, in pursuance of the terms of said agreement, the holders of said preferred stock paid to said Ryerson as trustee $27,666.68 in cash, and assigned their certificates of stock to the company which are now in the possession of the company.

Of the said second mortgage bonds delivered to said Ryerson he distributed $55,000 among said preferred stockholders, $27,333.32 on account of said stock and $27,666.68 for said cash advanced. The remaining $2,000 of said bonds are still held by said Ryerson and have never been issued. The owners of the common stock on July 8th, 1892, to wit: The said Russell, Peters and Dunlevy, in writing, ratified, confirmed and consented to the foregoing contract. The provisions of this contract were carried out by said Ryerson, except that he had in his hands $162.62 to be paid on certain debts of the company named in said agreement, and the further sum of $602.13 which was applied and credited on the principal of the said bonds under said contract.

The company made default in its payments of installments

of interest on said bonds becoming due September 1st and
October 1st, 1892, respectively and also failed to make the
statements of receipts, expenditures and financial condition
each month after the date of said trust deed, as required
thereby, and by reason of said defaults on November 4, 1892,
the complainants, the then owners of said second mortgage
bonds, under the terms of said trust deed, and after default
in payment of interest due on November 1st, 1892, elected to
and declared all said bonds due, and directed said Ryerson
to file the bill in this case, which was done in the names of
the bondholders and said trustee the same day. Prior to
July 8th, 1892, said Russell, the then owner of 592 shares of
the common stock of said company, had hypothecated the
same with divers parties as collateral security for advances
made to him. The persons holding said hypothecated stock
did not consent to the agreement and trust deed of July 8th,
1892.

The intervening petitioner, William P. Porter, is the owner
of five shares of said common stock and makes the same de-
fense to the complainants' bill herein as is made by the com-
pany.

In this court on November 18, 1892, the complainants,
Havemeyer and others, obtained judgment by confession upon
ten of said bonds under the power of attorney in said bonds
contained for $10,308.05 and costs.

*Quigg & Bentley,* solicitors for complainants.
*Tewkesbury & Culver,* solicitors for defendants.


Windes, J. :—

It is contended for the defendants that said Ryerson made
wrongful payments in several instances in the disbursements
of the cash paid to him by the preferred stockholders under
the agreement of July 8, 1892, but after full consideration
of the evidence, the master's report and arguments of coun-
sel, the court sees no reason to conclude differently from the
master in regard to those payments, and is of opinion that
all said payments were rightfully made.

It follows that if all the payments made by said Ryerson under said agreement of July 8, 1892, were rightfully made, then the statement above made by the court, that there was a default in the payment of the interest due on said bonds, is also well founded, unless the balance of $602.13 left in the hands of the trustee, Ryerson, should have been applied upon interest, the interest then due being less than that amount, instead of upon the principal of said bonds. This sum was properly applied to the principal of said bonds because the agreement of July 8, 1892, by a fair construction of its provisions, provides that any surplus remaining after the disbursements provided for by said contract should be divided among the parties contributing to the fund placed with said Ryerson.

As to the default of defendant, above stated by the court, in failing to make the statements of its receipts and disbursements, and a detail of its indebtedness, the court is of opinion that this was a material and important provision of said trust deed when considered in connection with the nature of the property conveyed by said trust deed and the business of the company, and the complainants were, under the evidence in the record and finding of the master, entirely justified in their action by reason of the default of the company in this record, in declaring the principal of said bonds due and directing the foreclosure of said trust deed.

The court has deemed it unnecessary to go into any discussion of the evidence as to the solvency of the defendant corporation or the payments made by the trustee under the agreement of July 8, 1892, or the default of the company in payment of interest or making statements, but has considered it sufficient to state only the conclusions arrived at after full consideration, which has been done.

Great stress has been laid by counsel for defendants upon the remarkably complicated relations sustained by the complainant, John A. Ryerson, to the parties in this case. He was a director of the defendant corporation, the representative of the preferred stockholders, himself also a preferred

stockholder, in one instance, at least, the attorney of the corporation in litigation prior to the commencement of this suit, and the trustee and agent of the corporation and preferred stockholders during a period of about one year prior to the filing of this bill, and also for a time one of the company's solicitors in this case. It must be admitted that this complication and blending of apparently inconsistent and diverse interests are such as are calculated to cause the court to look with scrutiny at Mr. Ryerson's testimony, which has been done; but inasmuch as all his acts appear to have had the approval of the other directors of the Bordeaux Company, and in conformity to the agreement of July 8, 1892, unless it be in the matter of the amount of attorneys' and trustees' fees, there being no proof of fraud, it seems to the court there is no sufficient foundation in the record to justify it in holding that any of the payments made by him except such as have been corrected, were improperly made. The payments made for these fees appear to be reasonable under all the circumstances shown. Even if these payments were held to be wrongful the only effect would be, under the agreement of July 8, 1892, to reduce the amount of complainants' claim. That Mr. Ryerson should claim one-half the fees allowed to complainants' solicitors in this case seems rather remarkable, but that claim should not prejudice complainants' rights in any way, especially since these rights are not dependent upon Mr. Ryerson's testimony.

There remain but two principal questions to be considered, as follows: First. The validity of the preferred stock. Second. The validity of the contract of July 8, 1892, and the exchange of the preferred stock for bonds. The textbooks, it is true, state as a general rule, that to enable a corporation to issue preferred stock it must have authority by statute, or its charter. Cook, Stockholders (1st Ed.) sec. 268; 2 Beach, Private Corporations, sec. 498. It is argued that under these authorities, and because there is no authority given by the charter of the Bordeaux Company, or by our statute, therefore the act of the company in issuing preferred

stock is void. The later edition of Mr. Cook on Stockholders, section 267, as also Mr. Beach, section 500, say, in substance, that there is no principle of law which forbids the issuance of preferred stock if all the stockholders give their consent. This seems to the court to be reasonable and in accordance with the decisions of the later cases and text writers. Morawetz, Corporations, sec. 464; *Harrison v. Mexican Railway Co.*, 44 L. J. Ch. 403; *Hazlehurst v. Savannah, etc., Ry. Co.*, 43 Ga. 13; *Lockhart v. Van Alstyne*, 31 Mich. 76; *Branch v. Jesup*, 106 U. S. 468; *Warren v. King*, 108 U. S. 389.

Besides this, if there was a want of power to issue preferred stock, the proof in this case that all the stockholders consented to making this preferred stock, and agreed to its issuance in payment for a valuable leasehold worth at least its face in cash at the time, and now worth many thousands of dollars in excess of that sum, would make it highly inequitable for the corporation now to claim the benefit of this leasehold, as it does, and claim that the consideration paid for it was worthless at the time. By the plainest principles of equity there is an estoppel against the corporation from making any such claim. Hazlehurst case, *supra.* Cook, Stockholders, sec. 267, and 500. *C., R. I. & P. R. R. Co. v. Joliet*, 79 Ill. 25; *Darst v. Gale*, 83 Ill. 136 and cases cited; *City of East St. Louis v. East St. Louis, etc., Co.*, 98 Ill. 415; *P. & S. R. R. Co. v. Thompson*, 103 Ill. 187.

That there appears to be nothing in the statutes in this state which in express terms authorizes the issuance of preferred stock, the court does not deem important, in view of the foregoing conclusions and authorities, and has therefore not mentioned in detail the arguments of defendant's counsel in that regard.

As to the next question, the validity of complainant's bonds received in exchange for the preferred stock, it should be noted that this stock was entitled to a cumulative dividend of eight per cent per annum from May 1, 1891, before any dividend should be paid on the remaining stock of the company, and in case of a sale of the property of the company was en-

titled to receive out of the proceeds of sale full par value before any payment on account of other stock.

This stock was exchanged under the agreement of July 8, 1892, for bonds at a premium of 9 1-3 per cent, or an advance of $2,333.33. This, it is claimed by defendants, was fraudulent as to the other stockholders, but the court is of opinion this contention is not sustained and is very unreasonable in view of the admitted facts of the case. The agreement of July 8, 1892, should be considered as a whole and in view of the financial situation of the defendant company. Without the aid of the preferred shareholders the company could not have continued long in business after that date. Its floating indebtedness exceeded $20,000 and was pressing, and the first mortgage indebtedness might have been foreclosed in default of interest being paid for thirty days, and for divers other reasons. If the preferred shareholders had conceived the idea of wrecking the company, as claimed by defendants, it would have been very easy for them to have declined to assist the company, and allowed its property to go to sale under proceedings in court by the holders of the floating indebtedness or by the holders of the first mortgage indebtedness and bought at such sale, or could have obtained their money for the preferred stock from the proceeds of such sale in preference to the holders of the common stock, or if the business could go on and there were profits realized the preferred shareholders could take all these profits to the extent of the dividends of eight per cent from May 1, 1891.

If the contention of defendants is true that the property was valuable, and there was a large margin for the stockholders, then, certainly, it was to the interest of the common stockholders for the business of the company to continue and profits to be made. If there was a possibility of profits for the holders of the common stock, then certainly the preferred stockholders had a most excellent investment which, in view of what appeared to be the prospects of the company on July 8, 1892, on the basis of its floating indebtedness being paid and its building and property being improved so as to yield a

good income, made the preferred stock worth a premium and all that was claimed for it in the exchange.

Also, if it could not be considered as worth the premium paid, the fact that the preferred stockholders furnished the money to pay the debts of the company and to buy furniture and improve its property, so as to make it possible for the company to continue its business, when the officers of the company had theretofore been unable to raise the money to pay the floating indebtedness, and assigning their stock which entitled them to eight per cent interest, was an ample and full consideration for the bonds which drew seven per cent interest. There then being a .valid and a sufficient consideration given by complainants for these bonds, they must be valid obligations of the company, if it had the power to exchange them for the stock.

The defendants contend this exchange was *ultra vires*, and to the extent of $27,666.66 the complainants have no right of recovery in this case. It seems to be the established law, as laid down by the text writers and the best considered cases, that a corporation may deal in its own stock, at least may receive its own stock in payment of, or to secure a debt due the company. Brice, Ultra Vires (2nd Ed.) p. 177, and cases cited; *Dupee v. Boston, etc., Co.*, 114 Mass. 37; *Fraser v. Ritchie*, 8 Ill. App. 554, and cases cited; *C. P. & S. W. R. R. Co. v. Marseilles*, 84 Ill. 643, and cases cited; *Chetlain v. Republic Life Ins Co.*, 86 Ill. 220. The contention is made that this exchange amounted to a retiring or decrease of $25,000 of the capital stock of the company, that the statute provides a way in which that should be done and therefore excludes this way of decreasing the capital stock. The answer to this is that the stock in this case was not cancelled but only assigned to the company, and may again be resold. Cook, Stockholders, sec. 314. In any event, unless prohibited by the charter, as was not the case at bar, the purchase by the directors of the company's stock is a matter within their power and will be upheld if not fraudulent. Generally it will not be upheld if in violation of the rights of the creditors.

In the case at bar no creditor is complaining, the act was approved by all the stockholders, and, as it seems to the court, it appeared at the time it was done to have been highly advantageous to the company, had its officers' expectations as to business been realized. Cook, Stockholders, secs. 907, 712.

It was also contended in the argument that inasmuch as a large amount of the common stock had been pledged by Russell prior to the making of this agreement of July 8, 1892, and these pledgees had no notice of this agreement and exchange, it was a fraud as to those pledgees and should be so held. The pledgees do not stand in the place of the owners of stock, are in no way liable as stockholders, and have no right to vote the stock and have no right to any notice of the acts of the directors. Revised Statutes, Illinois "Corporations," ch. 32, secs. 23, 24; Cook, Stockholders, secs. 40, 612, 733; *McDaniels v. Flowerbrook Manufacturing Co.*, 22 Vermont, 274; *Gibson v. Richmond & D. R. Co.*, 37 Fed. 743; *Mann v. Currie*, 2 Barb. 294; *Parsons v. Hayes,* 14 Abbott's New Cases, 419.

The master's report will be confirmed, and unless counsel can agree as to what will be a reasonable fee for the master's report the court will, after hearing counsel, fix master's fee.

The fee for complainants' solicitor may be fixed by the decree at $1,500 which the court regards as reasonable considering the evidence and the amount and nature of the services rendered and necessary to be rendered in case no appeal should be taken.

### NOTE.

(The above case is cited in Cook on Corporations (5th Ed.) pp. 584, 599, 670, 949.)

### RIGHT OF AN ILLINOIS CORPORATION TO ISSUE PREFERRED STOCK.

In *Higgins v. Lansingh*, 154 Ill. 301, 389 (1895), it appears that some time *after its incorporation*, The Rosehill Cemetery Company, at a meeting of the managers, authorized an issue of $25,000 of *preferred stock* to pay the debts of the company. A meeting of the stockholders had previously been called and by resolution had authorized the board of managers to issue that amount· of preferred stock. It does not appear that any holder of stock or certificates of

interest objected to such issue. In pursuance of this action of the stockholders and managers preferred stock to the amount of $25,000 was issued and used in paying various liabilities incurred by the company. The resolution authorizing its issue provided that the holders of this stock should be entitled to receive thereon a semi-annual dividend at the rate of ten per cent. per annum prior to the payment of any dividend on the other stock of the company. This dividend was paid, as authorized for many years, and the issuing of the stock appeared to have been acquiesced in by all the holders of the stock. It was held that after such acquiescence a stockholder was estopped from questioning the validity of this preferred stock. The court there said (p. 392): "The objections to the issue of preferred stock without power therefor under the charter are based upon the assumption that such issue would be in violation of the contract rights of the existing shareholders. If the existing shareholders unanimously give their consent to an issue of preferred shares, these objections would have no application. . . . It is, however, held that if otherwise properly issued and outstanding as corporate stock it may be valid as preferred stock by the original authority and consent of all the shareholders, or by their subsequent ratification or long acquiescence, notwithstanding the charter contains no authority for the issue of preferred stock."

In *First National Bank v. Peoria Watch Co.*, 191 Ill. 128, 135 (1901), it was held that a corporate creditor could not object to the issue of preferred stock so long as it was 'fully paid for, even though such stock was made preferred stock by agreement of stockholders, and not in accordance with any statute. The court there said (p. 135): "It can make no difference to a creditor if some part of the stock was issued as preferred stock, so long as the money went into the treasury and the dividends on such preferred stock were not paid or to be paid except out of net profits."

In *Cratty v. Peoria Law Library Association*, 219 Ill. 516 (1906), where at the incorporation of a law library association a preferred or guaranteed stock was created, the preferred stock was held to be validly issued, and dividends thereon were held enforceable from the net income, but not out of the capital stock. The court said (p. 523): "There is no objection to an agreement for preferred or guaranteed stock in the original organization of a corporation, where, as in this case, all the parties agree to it. Whether the stock is to be called interest-bearing stock, preferred stock or guaranteed stock makes no difference, as the terms when applied to shares of stock mean practically the same thing."

It is apparent, therefore, from the above cases that in Illinois a corporation of that state may by unanimous consent of all its stockholders issue preferred stock.—Ed.