The City of Chicago

v.

A. Montgomery Ward et al.

Opinion filed November 8, 1897.

1. Dedication—*what equivalent to a dedication of land for public use.* Leaving a tract of land in a platted addition without subdivision, one portion being marked on the plat as "public ground," another as "not to be occupied with buildings of any description," and the remainder held out to purchasers as "public ground—no buildings," is equivalent to a dedication of the land in trust for the public.

2. Same—*when purpose of public dedication may be shown by parol.* Where there is nothing to indicate for what particular use a grant or donation of land is made to the public, the purpose to which it was to be devoted may be shown by parol.

3. Same—*effect where fee is left in the owner.* Though a dedication to the public leaves the fee in the original owner, it is charged with the same public rights and interests as if the fee were vested in the public.

4. Same—*dedication of public park not affected by change in use of abutting buildings.* The dedication of land to the public as an open park and the vested rights of abutting owners therein are not affected by a change in the use of the abutting buildings.

5. Vested rights—*legislature cannot divest rights of abutting owners.* Vested rights acquired by abutting owners in having a public park maintained in accordance with the terms of the original dedication cannot be taken away by an act of the legislature authorizing the city holding the subject of the dedication in trust, to devote it to other uses.

6. Riparian rights—*title not lost by submersion or avulsion if soil is afterward reclaimed.* A riparian owner does not lose his property in the soil by submersion or avulsion, if the soil is afterward reclaimed, either by natural or artificial means, nor does the lapse of time during which the soil is submerged bar the owner's rights.

7. Same—*the city of Chicago did not lose its title to submerged portions of Lake Front Park.* By its reclamation of portions of Lake Front Park submerged by the waters of Lake Michigan after the original dedication of the park, the city of Chicago re-asserted its title thereto as such title stood at the dedication, and holds such portions subject to the original terms of the trust.

8. Parks—*city of Chicago has no right to erect buildings in Lake Front Park.* In the absence of consent from abutting owners the city of Chicago has no right to erect, or cause the erection of, any buildings upon the tract of land known as the Lake Front Park.

9. INJUNCTION—*when abutting owners may enjoin unauthorized use of public park.* Owners of lands abutting upon the Lake Front Park in Chicago may maintain a bill in equity to enjoin the city of Chicago from using such park for purposes prohibited by the terms of the trust under which the dedication was accepted.

WRIT OF ERROR to the Superior Court of Cook county; the Hon. THEODORE BRENTANO, Judge, presiding.

This was a bill for an injunction filed in the Superior Court of Cook county October 16, 1890, by A. Montgomery Ward and George R. Thorne, to enjoin the city of Chicago from erecting any buildings on what is known as Lake Park or Lake Front Park. The bill alleges that they are the owners of the south 43 feet of lot 3, and all of lots 4 and 5, in block 15, in Fort Dearborn addition to the city of Chicago, known as Nos. 111-116 Michigan avenue; that valuable buildings are erected on said lots and occupied by them in their business of importers, manufacturers and jobbers of general merchandise; that when said addition was platted an open space was reserved for public grounds east of Michigan avenue and between Randolph and Madison streets, fronting on Lake Michigan, subject to the prohibition that the grounds should be kept free from buildings; that the lots owned by them are worth more on account of such vacant grounds than they would be otherwise; that they have an easement in such grounds; that it was the duty of the city to prevent encroachments on such grounds, but that it has permitted the erection of certain structures thereon, contrary to the vested rights of complainants, etc.; and prays for an injunction restraining the city from violating the terms of the dedication, and against the erection of buildings, etc., thereon. The Illinois Central Railroad Company and a number of other parties were made defendants. A temporary injunction was granted and the city answered the bill, denying that it had committed the acts complained of or intended to erect any structures.

On May 6, 1893, the bill was amended.   The amended bill alleges that that part of Lake Park south of Madison street has been for many years public ground and park property, and the lots in Fort Dearborn addition were sold with the understanding that all of Lake Park should be and remain clear of all buildings, but that the city has suffered the Illinois Central Railroad Company and others to occupy portions of the park, and has suffered circuses, shows, etc., upon said premises; that it is using it as a dumping ground for garbage, rubbish, etc., and has constructed a scaffold and floor for that purpose, the filth and rubbish to be carried away by the railroad company, causing a great public nuisance; that the American Express Company has built a shed thereon; that there are seven or more railroad tracks upon it, upon which cars are permitted to stand; that the city has issued a permit to the Forepaugh shows to occupy part of the same; and prays for temporary injunction, and for mandatory injunction to remove all buildings, sheds, cars, tracks, and material of every kind from the park.

The city answered the amended bill, denying the alleged restrictions on the use of the park; alleging that the character of the buildings in Fort Dearborn addition and purposes for which they were used have entirely changed, for more than twenty-five years, from residence to business purposes, and that the use for which the public grounds were conveyed has long since ceased to attach thereto; denying that the property of complainants is enhanced in value by reason of its situation relative to the park, and that the owners have any easement of light, air or view over the same; denying that the grounds were dedicated for any specific public purpose, and alleging ownership by the city in fee simple absolute.

On June 8, 1896, complainants again amended their bill, with the stipulation that the answer of the city should stand as answer to such secondly amended bill.   This amendment sets out the history of the platting and dedi-

cation of the two additions to the city of Chicago, of which Lake Park is a part, at length; alleges that the city accepted the dedication by a resolution of April 29, 1844, which resolution ordered what is now called Lake Park to be enclosed as a public park at the expense of the subscribers of such enclosure; that the city council, by ordinance of August 10, 1847, designated the public ground so fenced in as "Lake Park;" that the abutting property owners on Michigan avenue had, prior thereto, erected a fence at their own expense around said park, and ornamented the same, etc.; recites section 64 of the act of February 14, 1861, in reference to the charter of the city of Chicago, and refers to the act of 1863 on the same subject; alleges that the construction of buildings on Lake Park, and its occupancy by railroad tracks or for other private purposes, and the licensing of the same for circus purposes, etc., and the employment of the same as a dumping ground for filth, etc., will constitute a public nuisance, and will divert the park from the purposes for which it was dedicated, and will constitute a private nuisance and inflict irreparable damage on the property of complainants, special to the same and distinct from that suffered by the public at large.

The final decree that was entered by the court recites that all the material allegations in the various bills and amendments are true; decrees that the injunction of May 25, 1890, be made perpetual; that the Illinois Central Railroad Company, and the city and its officers, desist and refrain from occupying any buildings or structures, except such as are described in the ordinance of October 21, 1895, upon the tract of land known as Lake Park; that they refrain from placing or causing to be placed thereon anything except for park purposes, and from using and permitting any portion thereof for railroad tracks, or such circuses or exhibitions to which the public will not be admitted free; that nothing in the decree shall be held to impair or diminish the rights, etc., of the Illinois Central

Railroad Company under the ordinance of October 21, 1895; that the Art Institute, and all necessary improvements thereon, so long as it shall be used in accordance with the terms of the ordinance authorizing its construction, shall be excluded from the operation of the decree; likewise the temporary post-office building until a new permanent post-office shall be completed. and occupied, and also, for a period of three months, the armory buildings. To reverse this decree the city of Chicago alone has sued out a writ of error from this court.

The evidence showed that the abutting property owners expended considerable sums of money from time to time, as also did the city of Chicago, in protecting said park from the ravages of Lake Michigan and in fencing and beautifying the grounds. It was declared by the government plat of the Fort Dearborn addition, that "the public ground between Randolph and Madison streets, *and fronting upon Lake Michigan,* is not to be occupied with buildings of any description." By a resolution adopted April 29, 1844, the city declared that all that part, of Michigan avenue lying east of a line 90 feet east of the east line of the tier of lots in section 15 fronting said avenue on the west, shall be enclosed as a public park, and the same resolution declared, in substance, that the public ground in the Fort Dearborn addition should be enclosed as a public park at the expense of subscribers to such enclosure. And in 1847, by an ordinance of the city, it was ordained: "The public ground east of the fence erected on the east side of Michigan avenue, from the north side of Randolph street to the south side of lot 8, in block 21, fractional section 15, addition to Chicago, (which was coincident with the south line of Park Row,) shall hereafter be known and designated as Lake Park." The city council passed another ordinance to the same effect August 25, 1851, which declared that the public ground on the east side of Michigan avenue, from the north line of Randolph street to the south line of Park

Row, should be designated as "Lake Park." Another ordinance to the same effect was passed by the city council in 1856; and in the ordinance granting a right of way to the Illinois Central Railroad Company, passed June 14, 1852, it was provided that said company should not, in any manner or for any purpose, occupy or intrude upon the open ground known as Lake Park, belonging to the city of Chicago, lying between Michigan avenue and the western or inner line before mentioned,—which was a line not less than 400 feet east of the west line of Michigan avenue and parallel thereto,—and similar inhibitions were imposed in subsequent ordinances.

The existence of this park was recognized by legislation of the State, by the acts passed in 1861 and 1863, in which the act incorporating the city of Chicago, and the several amendments thereto, were reduced to a single act, and in which, in section 64, was the following provision: "No encroachments shall be made upon the land or water west of a line mentioned in the second section of an ordinance concerning the Illinois Central railroad (which line is not less than 400 feet east from the west side of Michigan avenue, and parallel thereto,) by any railroad company, nor shall any cars, locomotives, engines, machines or other things belonging to any railroad or transportation company be permitted to occupy the same, nor shall any cars or machinery be left standing upon said track fronting any part of Michigan avenue, nor shall the city council ever allow any encroachments west of the line above described.    Any person being the owner of or interested in any lot or part of a lot fronting on Michigan avenue shall have the right to enjoin said company, and all other persons and corporations, from any violation of the provisions of this section or of said ordinance, and by bill or petition in chancery, in his or their own name or otherwise, enforce the provisions of the said ordinance and of this section, and recover such damages for any such encroachment or violation as the

court shall deem just. The State of Illinois, by its canal commissioners, having declared that the public grounds east of said lots should forever remain open and vacant, neither the common council of the city of Chicago, nor any other authority, shall ever have the power to permit encroachments thereon without the assent of all the persons owning lots or land on said street or avenue."

JESSE B. BARTON, for plaintiff in error:

The fee of all lands covered at ordinary stages of water in lakes, and at high tide in tide waters, is in the State. *Seaman* v. *Smith,* 24 Ill. 521; *Trustees* v. *Schroll,* 120 id. 509; *Fuller* v. *Shedd,* 161 id. 462; *People ex rel.* v. *Kirk,* 162 id. 138; *Railroad Co.* v. *Illinois,* 146 U. S. 387; *Ruge* v. *Oyster Canning Co.* 25 Fla. 656; *Dock Co.* v. *Trustees,* 39 N. J. Eq. 409; *Stevens* v. *Railroad Co.* 34 N. J. L. 532; *Hoboken* v. *Railroad Co.* 124 U. S. 688; *Bowlby* v. *Shively,* 152 id. 9; *Weber* v. *Harbor Comrs.* 18 Wall. 57; *Coburn* v. *Ames,* 52 Cal. 385; *Austin* v. *Railroad Co.* 45 Vt. 242; *Diedrick* v. *Railway Co.* 42 Wis. 248; *Insurance Co.* v. *Voorhis,* 24 N. Y. 529; *Saunders* v. *Railroad Co.* 144 id. 75.

A bill in equity will not lie to enjoin the vacation of a street or park by a city. *Parker* v. *Catholic Bishop,* 146 Ill. 158; *Chicago* v. *Building Ass.* 102 id. 379.

The legislature can authorize a city to sell property dedicated to public use. *VanNess* v. *Washington,* 4 Pet. 230; *Herbert* v. *DeValle,* 27 Ill. 448; *Railroad Co.* v. *Joliet,* 79 id. 25.

The acts of 1861 and 1863, giving owners of property abutting on Michigan avenue a right to enjoin encroachments on the Lake Front Park, were unconstitutional. *People* v. *Nelson,* 133 Ill. 578; *People* v. *Protestant Deaconesses,* 71 id. 229; *Snell* v. *Chicago,* 133 id. 413; *Dolese* v. *Pierce,* 124 id. 140.

The acts of 1861 and 1863 were abrogated by the constitution of 1870, and were repealed by the present city charter. Rev. Stat. chap. 24; *Cairo* v. *Gross,* 9 Ill. App. 406; 101 Ill. 475; *Mitchell* v. *People,* 70 id. 138.

Equity will not do what will be of no benefit to the party asking it and only impose hardship on the other party. *Green* v. *Green*, 34 Ill. 327; *Railroad Co.* v. *Healy*, 94 id. 416.

Injunction will not issue to gratify complainant's malice, nor to be used at his discretion. *Seeger* v. *Mueller*, 28 Ill. App. 31; *McCormick* v. *Jones*, 3 Blatchf. 486.

A court of equity will not aid one who has long acquiesced in the wrong complained of. *Roger* v. *Williams*, T. & R. 18; *Peck* v. *Matthews*, L. R. 3 Eq. 515.

Where restrictions on the sale of real estate have been imposed to effect a particular purpose, and the character of the property has so changed that that particular purpose cannot be effected even with the restrictions, a violation of the restrictions will not be enjoined, and one complaining will be remitted to his remedy at law, if any he has. *Trustees* v. *Thacher*, 87 N. Y. 311; *Amerman* v. *Deane*, 132 id. 355.

GEORGE P. MERRICK, for defendants in error:

Defendants in error, by virtue of their ownership of property abutting on a public square or park, may maintain a bill against the municipality to enjoin the destruction or curtailment of an easement thereover. High on Injunctions, secs. 824, 855; *Newell* v. *Sass*, 142 Ill. 104; *Cihak* v. *Klekr*, 117 id. 643; *United States* v. *Railroad Co.* 154 U. S. 225; *Earll* v. *Chicago*, 136 Ill. 277.

The dedication by the owners, and acceptance by the city of Chicago, of the Lake Park property constituted the city a trustee of said property, and impressed said property with a trust in favor of the public and of abutting lot owners. *Zearing* v. *Raber*, 74 Ill. 412; *Maywood Co.* v. *Maywood*, 118 id. 61; *Earll* v. *Chicago*, 136 id. 279; *Field* v. *Barling*, 149 id. 572.

The erection by the city of Chicago of any buildings upon the Lake Front Park is repugnant to the words of dedication and to the use of the property in question for the purpose for which it was dedicated. *Godfrey* v. *Alton*,

12 Ill. 35; *Princeville* v. *Auten,* 77 id. 325; *Nichols* v. *Davis,* 39 Ill. App. 610; *Jacksonville* v. *Railway Co.* 67 Ill. 544; *Warren* v. *Mayor,* 22 Iowa, 357; *County of Franklin* v. *Lathrop,* 9 Kan. 314; *LeClerq* v. *Gallipolis,* 7 Ohio, 318.

Accretions to a strip of land in a city along a·shore which is reserved for public purposes partake of the same nature as the original reservations, and the city holds title to the same subject to the same uses and conditions. 1 Am. & Eng. Ency. of Law, 138; *Godfrey* v. *Alton,* 12 Ill. 29; *Brooklyn* v. *Smith,* 104 id. 429.

Mr. JUSTICE CARTER delivered the opinion of the court:

The main question involved in this litigation is, has the city of Chicago a right to erect, or to permit to be erected, any buildings on the tract of land known as Lake Park? Lake Park is a tract of land extending from Randolph street on the north to Park Row on the south, and from the west line of Michigan avenue on the west a distance of 400 feet to the west line of the right of way of the Illinois Central Railroad Company. Leaving out Michigan avenue, which has a width of 90 feet, the park would be 310 feet wide and over a mile long.

In order properly to determine this question it will be necessary to advert to the history of Lake Park. In 1836 the commissioners of the Illinois and Michigan canal, under the authority conferred upon them by the General Assembly of the State, caused fractional section 15, lying along the shore of Lake Michigan and adjoining or cornering with the original town of Chicago, to be subdivided into lots, blocks and streets, and a plat thereof was made, acknowledged and recorded on July 20, 1836. This subdivision consists of two tiers of blocks, of eleven blocks each, bounded on the west by State street, on the north by the center line of Madison street and on the south by the center line of Twelfth street. The lots in the east half of the eastern tier of blocks all fronted to the east, and there was an open space between such east

line and the lake, except at the south-west corner, in which block 23 was laid off, beginning 120 feet east of the east line of the eastern tier of blocks and running thence east 500 feet, of a uniform depth toward the north of 200 feet, leaving a small space, the width of which was not marked on the map, about 80 feet, between the eastern-most lot of block 23 and the lake. The street north of this block 23 is now known as Park Row. The distance from the eastern tier of blocks to the lake shore was therefore about 700 feet at Park Row. The distance at the north line of the section from the lake shore to the east line of the eastern tier of blocks was not marked on the plat, but appears to have been about 500 feet. All the space north of block 23 and east of the eastern tier of blocks to the lake was left unsubdivided and vacant, except that the words "Michigan avenue" appear on the same next to the line of subdivided blocks.   J. Y. Scammon testified that he measured the width of the ground east of Michigan avenue in 1836, when the canal commissioners made their subdivision, and it was then about 700 feet wide at the south end and between 500 and 600 feet at the north end, and that the ground was a little wider at some places than others.   Fernando Jones testified that he was employed in the office of the canal commissioners in 1836; that it was stated by and on behalf of the commissioners, to all persons purchasing lots in the subdivision, as an inducement to such purchases, that there would be no buildings to obstruct the view of the lake, and that the commissioners used a sketch to sell from and to point out the position of lots to purchasers, and on the sketch was marked, "Open ground—no building;" that the land fronting on Michigan avenue, as well as that fronting on Wabash avenue,—the next street west,—sold at a higher price on account of the eastern exposure on the lake.

The land north of section 15, running to the Chicago river, being the south-west fractional quarter of section 10, was used by the United States as the military post of

Fort Dearborn as early as 1804. Under authority from the
Secretary of War this fractional quarter was subdivided
into blocks, lots, streets and public grounds and called
"Fort Dearborn addition," and a plat of the addition was
acknowledged and recorded on June 7, 1839. Michigan
avenue was continued north in this plat almost up to
the river, but its width was not marked on the plat. The
ground between Michigan avenue and the lake was also
laid off into blocks and lots from the river down to Ran-
dolph street, but from the north line of that street to
the south line of the section, being the center of Madison
street, the space between the west line of Michigan ave-
nue and the lake was left vacant and unsubdivided, as
was also the east half of the block just south of Randolph
street, between Wabash avenue on the west and Michi-
gan avenue on the east, and in this blank space on the plat
was written, "Public ground forever to remain vacant of
buildings." The certificate of the Secretary of War, writ-
ten on the margin of the plat, contains these words: "The
public ground between Randolph and Madison streets,
and fronting upon Lake Michigan, is not to be occupied
with buildings of any description." The plat shows that
the southernmost lot of block 11, which lies between
Michigan avenue and the lake and on the north side of
Randolph street, and is thus the northern boundary of
the unsubdivided space, had a frontage of 73 feet on Ran-
dolph street. There are no figures at the south line of
the addition to indicate the distance between the west
line of Michigan avenue and the lake, but measuring on
the plat according to its scale it was 200 feet. Michigan
avenue is 90 feet wide.

It will thus be seen that the land lying east of the
west line of Michigan avenue, from Randolph street on
the north to Park Row on the south, was by its original
owners left unsubdivided; that that portion in fractional
section 10 was expressly dedicated as "public ground"
"not to be occupied with buildings of any description,"

and that that portion in fractional section 15 was marked near one edge "Michigan avenue," and was held out to purchasers as "open ground—no buildings." That this was equivalent to a dedication for such use and purpose has been repeatedly announced by this court, (*Godfrey* v. *City of Alton,* 12 Ill. 29, *Marcy* v. *Taylor,* 19 id. 634, *Smith* v. *Town of Flora,* 64 id. 93, *Maywood Co.* v. *Village of Maywood,* 118 id. 61,) and where nothing appears to indicate for what particular use a grant or donation of land is made to the public, parol evidence is admissible to show the object to which it was to be devoted. (*Village of Prince-ville* v. *Auten,* 77 Ill. 325.) That the city of Chicago accepted the ground thus dedicated is undisputed. The statute provides that such dedicated lands shall be held in trust to and for the uses and purposes expressed or intended, and even in a common law dedication, which leaves the fee in the original owner, it is charged with the same rights and interests in the public which it would have if the fee were in the municipality. *Chicago, Rock Island and Pacific Railroad Co.* v. *City of Joliet,* 79 Ill. 25.

That the land was so dedicated and accepted subject to the restrictions imposed of being forever unoccupied by buildings, and that this restriction extended to and included all the land between the west line of Michigan avenue and the shore of the lake as it was when these lands were platted, we entertain no doubt. But it is contended by plaintiff in error that only such land as existed between Michigan avenue and the shore of the lake as it was in 1852, when the encroachments of the lake on the land were stopped by the building of breakwaters, etc., was subject to such restrictions; that the remainder having been carried away by the waters of Lake Michigan, the boundaries of the public land were restricted to the shore of the lake, and that all the made or reclaimed land between the shore line of 1852 and the west line of the Illinois Central Railroad Company's right of way is free from such restrictions. A consideration of this ques-

tion will necessitate a further retrospect into the history of Lake Park.

Referring again to the testimony of J. Y. Scammon, we find that the building of the piers of the Chicago river by the government eastward into Lake Michigan had the effect of throwing a strong current of water against the shore of section 10, and that when the piers were still further extended the current was thrown further south against the shore of section 15; that this current would gradually undermine the bank, and then a storm would come and the bank would fall,—sometimes five, ten and thirty feet in width at a time; that sometimes there would be washed away a hundred feet in a single storm, then the wind would change and there would be a deposit of sand again; that in 1835 there were 200 or 300 feet between Michigan avenue and the shore at Randolph street, but two-thirds had been washed away before the platting of Fort Dearborn addition in 1839. Fernando Jones testified that prior to 1839 the waves cut away mostly between Randolph and Madison streets, and what was cut away there was deposited more or less south of Madison street, but after 1839 the big storms that came would wash away the banks as far down as Park Row; that the "shore went off in chunks" during the storms; that sometimes after a storm there would be some accretions. The testimony of R. B. Mason shows that in 1852 the shore of Lake Michigan was distant from the west line of Michigan avenue at Park Row a little over 400 feet, thence the trend of the shore was to the west till it was only 90 feet at Monroe street, which is the street next south after Madison. It was the same width at Madison street, and, gradually receding again to the east, it was 112½ feet at Washington street, the next street north, and the same width at Randolph street, the next street north of Washington street. Michigan avenue being 90 feet wide, it will thus be seen that, from the north line at Randolph street, with a width of 22½ feet, the park extended down to

about Madison street, a distance of two blocks, where the waters of Lake Michigan lapped the east side of Michigan avenue, and then the park re-commenced at about Monroe street and gradually widened out to 310 feet at Park Row.

In 1852 the Illinois Central Railroad Company, by an ordinance of the city of Chicago, was granted the right of way of the width of 300 feet from the southern boundary of the public ground near Twelfth street to the north line of Randolph street, the inner or west line of the ground to be used by the company to be not less than 400 feet east from the west line of Michigan avenue. It was also required by the ordinance to erect and forever after to maintain a continuous wall or structure of stone masonry of regular and sightly appearance, and not to exceed in height the general level of Michigan avenue opposite thereto, from the north side of Randolph street to the southern boundary of Lake Park, at a distance of not more than 300 feet east from the above mentioned west or inner line, which structure was to be of sufficient strength and magnitude to protect the entire front from further damage or injury from the action of the waters of Lake Michigan. It was further provided that the company should not, in any manner or for any purpose whatever, occupy, use or intrude upon the open ground known as Lake Park, belonging to the city, and that it should erect no buildings between the north line of Randolph street and the south line of Lake Park, nor place upon any part of their works between these points any obstructions to the view of the lake from the shore, and that it should make and keep open through its works such culverts or ways as would afford room for the uninterrupted flow of water from the open lake to the space inside of the inner or west line above mentioned. In pursuance of the rights thereby granted the railroad company placed piling in the waters of the lake from Twelfth street northward, and built its tracks thereon, and built a breakwater east

of its roadway. The water space between the shore and the right of way was gradually filled up by the citizens, although at the time of the great fire of 1871 there was still a basin there, used for row boats and sail boats. After the fire the council passed an ordinance permitting the dumping of debris resulting from the fire into this space, and, the railroad company having filled in under its tracks, soon there was no more water left west of the east line of its right of way. That the city made ineffectual efforts to stay the destroying power of the waters of Lake Michigan prior to the building of the railroad breakwater is not disputed. As we have seen before, the width of the open space at Park Row, in 1836, when it was dedicated, was about 700 feet and at Madison street about 500 feet. The width of Lake Park, including Michigan avenue, is 400 feet. There was, therefore, in 1836, more than enough ground lying along the lake shore between these points for this park. From Madison street to the north line of the park when this space was dedicated, in 1839, (three years later,) there was an open space between the shore and the east line of blocks of only 200 feet at Madison street, narrowing down to 163 feet at Randolph street, thus lacking from 237 feet to 200 feet of being 400 feet wide.

Did the city lose its title and rights to the portions of this park submerged by the waters of the lake after its dedication, or did its subsequent reclamation restore the city to its rights? Did the temporary submergence of such portions destroy the restrictions imposed by the dedication, so that the reclaimed portion would not be subject to the same? The destruction of the shore line was not gradual and imperceptible, but was sudden, and plainly discernible after every storm, and the city made unavailing efforts to protect the shore from this destruction. In a conveyance calling for a lake as a line, the line at which the water usually stands when free from disturbing causes is the boundary of the land. *Seaman* v.

*Smith,* 24 Ill. 521; *Trustees of Schools* v. *Schroll,* 120 id. 509; *Fuller* v. *Shedd,* 161 id. 462; *People* v. *Kirk,* 162 id. 138.

In Hargrave's Law Tracts, (Sir Matthew Hale's De Jure Maris,) 36, 37, it is said: "If a subject hath land adjoining the sea, and the violence of the sea swallow it up, but so that yet there be reasonable marks to continue the notice of it, or, though the marks be defaced, yet if by situation and extent of quantity and bounding upon the firm land the same can be known, though the sea leave this land again, or it be by art or industry regained, the subject does not lose his property; and accordingly it was held by Cooke and Foster, M., (7 Jac. C. B.), though the inundation continue forty years. * * * But if it be freely left again by the reflux and recess of the sea the owner may have his land as before, if he can make it out where and what it was, for he cannot lose his propriety of the soil, though it be for a time become part of the sea and within the admiral jurisdiction while it so continues."

In *Morris* v. *Brooke,* (an unreported case arising in 1815 in Delaware,) quoted in *Mulry* v. *Norton,* 100 N. Y. 426, Judge Wilson said: "Though the surface of the lower part of that island (Little Tinnicum) was destroyed by the force of the winds and the waves, and it was consequently overflowed by the waters of the river, yet the owner did not lose the propriety of the remaining soil covered by the water. If it was regained, either by natural or artificial means, it continued to belong to the original proprietor. He might embank it, and thereby again exclude the waters, if circumstances permitted." And in *Mulry* v. *Norton, supra,* it is said: "When portions of the main land have been gradually encroached upon by the ocean, so that navigable channels have been extended thereover, the people, by virtue of their sovereignty over public highways, undoubtedly succeed to the control of such channels, and the ownership of the land under them, in case of its permanent acquisition by the

sea. It is equally true, however, that when the water disappears from the land, either by its gradual retirement therefrom or the elevation of the land by avulsion or accretion, or even the exclusion of the water by artificial means, its proprietorship returns to the original riparian owners. Neither does the lapse of time during which the submergence continues bar the right of such owner to enter upon the land reclaimed and assert his proprietorship." (See Angell on Tide Waters, 77-80.) "Where considerable quantities of soil are, by a sudden action of the water, taken from the land of one, this is called avulsion; but the ownership is not lost, though the surface earth is thus transported elsewhere, and it may be reclaimed and the ownership re-asserted." Angell on Water-courses, sec. 60; 3 Washburn on Real Prop. 453; *Gale* v. *Kinzie,* 80 Ill. 132.

Under the authorities, and according to all reasonable deductions from legal principles, we must hold that the title to these lands submerged by the action of Lake Michigan was not lost, and that by their subsequent reclamation the city has completely re-asserted its title thereto, as such title stood at the time of the dedication of the respective plats thereof. The trust impressed on them was that they should forever remain free from buildings, and it cannot be said that while they were submerged they were subject to be built upon. We do not see that the submergence and subsequent reclamation altered or destroyed the trust upon and for which they were held.

As the city had, as we have seen, the fee in this park, impressed with the trust declared by the dedicators, the legislation of 1861 and 1863 added nothing to its trust and can only be looked upon as confirmatory of the same. Section 64 of the act of 1861, identical with section 43 of the act of 1863, both acts being acts relative to the charter of the city of Chicago, provided that no encroachments should be made upon the land or water west of

the railroad right of way by any railroad company nor allowed thereon by the city council; that any property owner on Michigan avenue should have the right to enjoin any such attempted encroachments and recover damages therefor; and recited that "the State of Illinois, by its canal commissioners, having declared that the public grounds east of said lots should forever remain open and vacant, neither the common council of the city of Chicago nor any other authority shall ever have the power to permit encroachments thereon without the assent of all the persons owning lots or land on said street or avenue." No new trust was created by these statutes. They merely ordained as law what was already the law in reference to Lake Park.

A point is made by counsel for plaintiff in error on the use of the word "encroachment," it being contended that buildings would not be an encroachment, as that word is defined by Webster. Wood on Nuisances (2d ed. sec. 77,) says: "A purpresture is any encroachment upon real property, or right and easements incident thereto, belonging to the public, by an enclosure or erection thereon which, if made upon the property of an individual, would be a trespass."

In 1869 the legislature passed the act known as the "Lake Front act." By section 1 of this act the General Assembly purported to grant to the city of Chicago in fee, with full power and authority to sell and convey in such manner and upon such terms as the council might by ordinance provide, all right, title and interest of the State of Illinois in and to so much of fractional section 15 as is situated east of Michigan avenue and north of Park Row, and south of the south line of Monroe street and west of the railroad right of way, being a strip 400 feet in width, including said avenue along the shore of Lake Michigan, and partially submerged by the waters of the lake, reserving, however, the 90-foot avenue from the right to sell. By section 4 all the right and title of.

the State of Illinois in and to the lands, submerged or otherwise, lying north of the south line of Monroe street and south of the south line of Randolph street, and between the east line of Michigan avenue and the railroad right of way, were granted in fee to the Illinois Central Railroad Company, the Chicago, Burlington and Quincy Railroad Company and the Michigan Central Railroad Company, for the erection thereon of a passenger depot and for other railroad business. Section 5 required these railroad companies, in consideration of this grant, to pay the city of Chicago $800,000, to be paid in quarterly installments. By section 6 the city council was authorized to quit-claim and release to said companies all the city's claim and interest in this tract which it might have by virtue of any expenditures and improvements thereon or otherwise, and in case it neglected or refused to do so within four months after the passage of the act, then the companies should be discharged from paying the unpaid balance to the city. By sections 2 and 5 all these moneys arising from the sale of Lake Park were to be placed in a park fund of the city of Chicago, to be equitably distributed among the three divisions of the city. Section 3 confirmed to the Illinois Central Railroad Company certain rights to the lands east of Lake Park covered by its railroad tracks, and granted to it in fee all the right and title of the State of Illinois in and to the submerged lands constituting the bed of Lake Michigan, and lying east of its tracks and breakwater, for the distance of one mile, and between the south line of the south pier extended eastwardly and a line extended eastwardly from the south line of lot 21, south of and near its round-house and machine shops, on the payment of the same percentage of the gross receipts from its use as it was bound to pay to the State by its charter on its gross receipts, which tract of submerged land so granted exceeded one thousand acres. This act was passed over the Governor's veto April 16, 1869.

About July 1, 1869, the three railroad companies tendered to Walter Kimball, then city comptroller, the first installment of $200,000, which he refused to accept in his official capacity, but gave his individual receipt therefor and reported the fact to the city council. The matter was referred to the judiciary committee, which, on December 20, 1869, reported back to the council, reciting the several dedications above described, together with the facts regarding the washing away of the shore and the attempts made to prevent the same, and the expenditure of money therefor, and that the city had been for years engaged in reclaiming that part of the land so dedicated, and had succeeded in reclaiming all that portion north of Monroe street; that, so far the citizens of Chicago and the owners of the property fronting on said public grounds are concerned, the city stands in the position of a trustee; that it would be a most flagrant and unjustifiable breach of trust upon the part of the city to sell the property or in any manner to consent that this land shall be appropriated to other than public uses, and recommended the passage of a resolution declaring that the city will not receive any money from the railroad companies under the said act of the General Assembly until forced to do so by the courts. The resolution was subsequently passed, and the money was afterward returned to the railroad companies at their request.

It is plain the city repudiated the privilege granted it by the legislature, and never accepted the act as binding on it. It may be said, in passing, that the Supreme Court of the United States, in *Illinois Central Railroad Co.* v. *Illinois*, 146 U. S. 387, denied the right of the legislature to make this extensive grant of the submerged lands in the harbor of Chicago and held the grant to the railroad company to be ineffective, with certain exceptions. As we have already seen, all the rights in regard to Lake Park had long previously been fixed by the acts of dedication by the original owners, the acceptance of the city

and the acquiescence and acts of the public and abutting property owners. It was beyond the power of the legislature to change the legal result of these acts, as it would be an impairment of vested rights which are protected by the constitution. In *City of Jacksonville* v. *Jacksonville Railway Co.* 67 Ill. 540, this court said (p. 543): "A dedication must always be construed with reference to the object with which it was made. * * * The power of the legislature to repeal the charters of municipal corporations cannot be extended to the right to divert property given to the public for one use, to a wholly different and inconsistent use. The power cannot exist to divert property from the purpose for which it was donated. This plat was a solemn dedication of the ground to the corporation, to be held in trust for the use of the public. The donation was made for a certain specific and defined purpose. * * * It must be preserved or the land must revert to the original proprietors." The court cite, as fully sustaining the view it has taken, *City of Cincinnati* v. *Lessee of White*, 6 Pet. 431; *Village of Watertown* v. *Cowen*, 4 Paige, 510; *Carter* v. *City of Chicago*, 57 Ill. 283; *LeClercq* v. *Town of Gallipolis*, 7 Ohio, 354; *Price* v. *Thompson*, 48 Mo. 361; *Warren* v. *Mayor of Lyons*, 22 Iowa, 351. In *Village of Princeville* v. *Auten*, 77 Ill. 325, it is said (p. 327): "Had this intention [that a certain square should forever remain an open space] been expressed on the plat, or even in the contemporaneous certificates, it is clear, on principle and authority, the village trustees could not lawfully appropriate it to any other public use. It would have been an abuse of the trust reposed in them, that the courts would not hesitate to control, that the property might be preserved for the uses intended by the donors." It is only where the dedication of the property as public ground is an *unrestricted* dedication to public use that the city or legislature may designate the uses to which it shall be put. *Chicago, Rock Island and Pacific Railroad Co.* v. *City of Joliet*, 79 Ill. 25.

As the legislature was powerless to take away any vested rights abutting property holders had in Lake Park, it is unnecessary to discuss the effect of the repeal of the act of 1869 by the legislature in 1873. The same authorities and course of reasoning also negative the proposition put forth by plaintiff in error that where the restrictions placed on the use of real property have become useless by the change of the character of the surrounding property and neighborhood, they may be disregarded. It is assumed by plaintiff in error that these open spaces were dedicated for a park, to remain free from buildings, because Michigan avenue was then a residence street, and that because of the gradual disappearance of residences from the upper end of this street, and their replacement by business houses, therefore the open space, clear of buildings, was not needed any more. That this reasoning is fallacious need hardly be demonstrated. It is a matter of common knowledge that nearly all of our larger cities have open squares in the business portions of the city, and that these open squares are deemed and considered of great advantage, not only to the public generally, but especially to the abutting property owners. In this case it is a vested right attaching to the abutting property by virtue of the original dedications. The cases cited in support of the position of plaintiff in error are not applicable to the facts of this case. They were cases relating to restrictive covenants in deeds, where the original owner had devised a scheme for improving the neighborhood by controlling the erection of buildings in a particular way. They have no relevancy to the case of an open park. No change in the use of the buildings abutting on a park could make the park any less a park or deprive the abutting owners of their vested rights.

But there is a strip of land within said park, as claimed by complainants, lying along fractional section 10, which cannot be said to have been reclaimed by the city after

having been submerged by the lake after the dedication in 1839. Neither was this strip formed by the slow and imperceptible process of accretion, but it is made or filled land, and is 237 feet wide at the north line of Randolph street and about 200 feet wide at the center of Madison street, as stated above, and the question remains whether or not this strip is held by the city subject to the restrictions placed upon that part of Fort Dearborn addition adjoining it.

If this strip had been formed by gradual accretions caused by the action of the waters it would have become a part of the shore lands. In *Godfrey* v. *City of Alton,* 12 Ill. 29, this court held that "all accretions to a public landing must necessarily attach to and form a part of it, otherwise we should have the novel spectacle of a public landing separated from the water." In *Lombard* v. *Kinzie,* 73 Ill. 446, the question arose whether the widow of a riparian owner was entitled to dower in accretions to land which had accrued after the husband had parted with the land, and it was there held she was entitled to dower in such accretions; that when formed, such accretions become subject, as an incident to the fee, to the same conditions, rights and burdens as the principal to which they are an incident. In *Cobb* v. *Lavalle,* 89 Ill. 331, it was held that the lessee of a property fronting upon a river is entitled to hold accretions as a part and parcel of the property leased. In *Chicago Dock and Canal Co.* v. *Kinzie,* 93 Ill. 415, the lot in question was bounded on the east by Lake Michigan, and this court said (p. 429): "To ascertain its eastern boundary it would be necessary to ascertain where was the line between the land and the lake; and since the accretions became a part of the land to which they were attached, it would necessarily follow that that line would follow the receding lake to the east. The accretions do not pass as appurtenant to water lot 36, but as a part of that lot." But the strip in question is filled land, and not formed by accretions.

It is admitted that the title to this strip is also in the city, but such admission does not cover the question whether the city owns it in trust as public ground or as a part of said public park, or holds absolute title thereto in its own right, with the right to use or dispose of the property as it may see proper. Counsel for plaintiff in error says in his argument that it does not appear from the record how the city acquired title to the submerged lands north of Monroe street, which includes this strip, but claims that between the city and the State that question has been adjudicated. (*Illinois Central Railroad Co.* v. *Illinois*, 146 U. S. 387.) The question here, however, is one between these abutting property owners and the city, and if the strip last mentioned is subject to the same trust as the remainder of said park, or that part of it which became submerged after its dedication and was thereafter reclaimed, then, so far as this case is concerned, it must be regarded as a part of said public park, and the right of the city to authorize the construction of buildings upon it must be denied, if such right is denied as to the rest of the park, whatever the rights of the State might appear to be in a case where that question might be at issue.

These open lands fronting on Lake Michigan, as we have seen, had been dedicated as public ground to be kept free from buildings, and both the city and the State, by their respective legislative bodies, had declared them to be a public park to be kept open and vacant and free from encroachments. These lands declared to be a public park extended to the waters of Lake Michigan, and the title thereto carried with it riparian rights incident to its location upon the banks of the lake. These riparian rights were property rights, which the city of Chicago held in trust in the same manner that it held title to these public grounds, and whether, under any circumstances, it could, by obtaining title to the lands under the shoal waters adjacent to the park and by filling in, destroy such riparian rights and hold the title to such filled lands free

from such trust it is not necessary here to decide, for we are satisfied, from the evidence in the case showing the acts and declarations of the city authorities in dealing with these lands, the abutting property owners had the right to assume and rest in the belief that the city was not acting in antagonism to its trust and with the purpose of destroying such riparian rights which attached to the public grounds, and of thereby acquiring an independent title to itself, but was, as such trustee, maintaining and preserving the property rights which it held in trust, and was improving said park and extending its boundaries into shallow waters of the lake. The city was a trustee, and, besides, it had the power, by its charter, to lay out, establish, open, extend and improve parks and public grounds; and so far as it made any addition, if it did make any, to Lake Park, by filling in said strip of submerged lands, it must, upon the record before us, be presumed that it was acting under its charter powers, and in preservation of the trust imposed upon it by the dedication, and its acceptance thereof, of these public grounds, and we are of the opinion that the city is estopped from claiming title to the same free from such trust. We have been referred to *Ruge* v. *Apalachicola Oyster Canning and Fish Co.* 6 So. Rep. (Fla.) 489, and other cases as announcing a different doctrine. But the facts in those cases were different from the facts disclosed by this record, and we cannot see that the reasoning employed, if adopted, would, on a record of this character, lead to a different conclusion.

The next point of plaintiff in error is, that defendants in error have no standing in a court of equity to obtain the relief sought by their bill. In *City of Jacksonville* v. *Jacksonville Railway Co. supra*, we said (p. 544): "A court of equity has the right to enforce the execution of the plainly declared trust, either upon the application of the owners of lots abutting on the square, or upon the application of the city, the trustee.  *  *  *  The square is

valuable property, intended for the use of the public, and appurtenant to the estates of the abutting lot owners." (See, also, the cases cited above, in connection with that case.) In *Village of Princeville* v. *Auten, supra,* the village trustees were enjoined from putting a town hall on the "public square" at the suit of Auten and others, and this court affirmed the decree. In *Earll* v. *City of Chicago,* 136 Ill. 277, where there was a cross-petition for an injunction, the court said (p. 288): "Where there is a special trust in favor of an adjoining property holder, or a special injury, a bill or suit may be maintained by an individual in respect to a public street or highway," and the decree granting the injunction was affirmed. In *Maywood Co.* v. *Village of Maywood, supra,* it was contended that there was a misjoinder of complainants, and the court said (p. 73): "Small and Hubbard, as residents of the village, have a common interest with each other, and with the village itself, in preventing any obstruction to the use of the public square for the purposes of a park. They are, therefore, properly joined with the village as complainants." In *United States* v. *Illinois Central Railroad Co.* 154 U. S. 225, the Supreme Court of the United States, in speaking of that part of Lake Park dedicated by the Secretary of War, said: "The only parties interested in the public use for which the ground was dedicated are the owners of lots abutting on the ground dedicated and the public in general. The owners of abutting lots may be presumed to have purchased in part consideration of the enhanced value of the property from the dedication, and it may be conceded they have a right to invoke, through the proper public authorities, the protection of the property in the use for which it was dedicated." Defendants in error are the owners of the south 43 feet of lot 3, and all of lots 4 and 5, in block 15, of Fort Dearborn addition, and have a frontage on Lake Park of 139 feet. They are clearly abutting owners, and, as such, have a right to maintain this action.

Nor does it make any difference that Lake Park was dedicated by two different owners at different times. The canal commissioners dedicated that part in fractional section 15 first, and in selling the abutting lots held out to purchasers the fact that such space should be clear of buildings, as an inducement. The Secretary of War, who dedicated the remainder of the park in fractional section 10 three years later, it is evident, did this in order to make one continuous open space, and expressly certified that such space should remain clear from buildings, thus following and continuing the practice of the canal commissioners. Besides, this open space has always been treated by the city and the public as *one* park.

But it is further urged against the contentions of defendants in error, that they are estopped by consenting to repeated violations of the injunction and of their rights in the park, and that by discriminating in favor of certain violators they have waived their right to restrain others committing similar violations. The proceedings and decrees in quite a number of suits were introduced in evidence, showing that, since the Lake Front act of 1869, there has been a great deal of litigation in the State and Federal courts over the use of the park. The first was a suit in the Federal court to prevent the railroads from taking possession of that part of the park north of Madison street under the act of 1869, instituted by one Starkweather against the Illinois Central Railroad Company, and afterwards consolidated with a similar suit by the United States against the same company, brought on behalf of the abutting property owners in fractional section 15 by the United States district attorney, in which the injunction as prayed for was granted in both cases. In the summer of 1871 the first structure of any kind was built upon Lake Park, the ground between Randolph and Madison streets having been fenced in and used as a ball ground; and again, between 1877 and 1884, the same ground was fenced up and used by the Chicago base ball club,

but in the latter year a bill was filed in the Federal court on behalf of the abutting property owners of Fort Dearborn addition, by the United States, against the club and the city, to enjoy the maintenance of fences, buildings, etc., and to compel their removal. The injunction was granted against the club and the city, absolutely prohibiting the maintenance of any building or structure on that part of the park described in the bill, and the base ball club removed their structures in compliance with the order. In 1882 the property owners procured a suit to be started in the United States Circuit Court to enjoin the Baltimore and Ohio Railroad Company from laying tracks in Lake Park, which is still pending. In March, 1883, the property owners procured one Stafford to file a bill in the circuit court of Cook county, against the city, the Trade and Labor Assembly, and a number of other corporations, railroad companies, etc., to enjoin them from occupying and encumbering, with buildings or otherwise, any part of Lake Park, and the injunction was granted enjoining the erection of any building on fractional section 15, and in May, 1883, another injunction writ was issued against the city to the same effect. In 1883 a suit was begun in the State court by the Attorney General against the Illinois Central Railroad Company and the city of Chicago, which was afterward removed to the Federal court, to determine the title and rights of the several parties to the lands lying east of Michigan avenue, to which bill the city of Chicago filed a cross-bill, and in which suit a decree was entered September 24, 1888, finding, among other things, that the city had title in fee to Lake Park, which decree was afterwards, December 5, 1892, affirmed by the Supreme Court of the United States. (33 Fed. Rep. 730; 146 U. S. 387.)

The city has also, at various times, assumed the right to grant permission to erect structures on Lake Park or to use the same for various purposes. The first was April 23, 1873, when it authorized the erection of what was

termed the "Exposition Building," between Monroe and
Van Buren streets, on Lake Park, but such building was
not to remain longer than May 1, 1877. The time was
afterwards extended. In 1889 W. T. Leland, an abutting
property owner, procured an injunction from the circuit
court of Cook county restraining the city and the Expo-
sition Association from erecting any structure on that
part of the park in section 15. The city then, on Decem-
ber 29, 1890, ordered the removal of all buildings from the
park except the two armories, and finally, on February
9, 1891, ordered the removal of the exposition building
within ninety days, and it was torn down. On March 30,
1891, an ordinance was passed giving the right to the
World's Columbian Exposition to construct and maintain
the building known as the Art Institute on the lake front,
the title of the building to vest in the city, but the right
to use and occupy the same to vest in the Art Institute
as long as it should comply with the terms and conditions
in the ordinance, which required free admission to the
public on Wednesdays, Saturdays and Sundays, with the
right to charge admission at other times, though profes-
sors and teachers in the public schools and other institu-
tions of learning in Chicago should be admitted free at
all times. It was then sought to have the above injunc-
tion in the *Leland case* modified to permit the erection
of this building, and such modification having been as-
sented to in writing by all the property owners, it was
accordingly modified, notwithstanding the objections of
Mrs. Sarah A. Daggett, whose husband had signed her
assent to the proposed modification. In pursuance of the
permission thus granted the Art Institute building was
subsequently erected, with a frontage of about 300 feet.
In 1892 permission was given to erect a frame wigwam
for the accommodation of the Democratic National Con-
vention on the lake front, which was accordingly erected,
and afterwards torn down, as required by the city. In
the same year the use of the lake front north of Madison

street for the construction of a temporary post-office was tendered to the United States, and a temporary post-office building erected in pursuance of such resolution, the same to be removed as soon as a permanent post-office is built.  In 1881 the city granted permission to Battery D to occupy 125 feet of Lake Park north of Monroe street for an armory building, and also permission to the First Regiment of Cavalry to erect a similar building just north of the former.  Both buildings were erected, of 125 feet front, one story high, extending nearly back to the railroad.  In 1886, the city council granted a place of burial to the family of the late Gen. John A. Logan in Lake Park, on the recommendation of the corporation counsel that such use would not be inconsistent with its use as a park.  During all this time there were numerous orders and resolutions of the city council directing the removal of tracks, platforms, express buildings, sheds and other obstructions, nearly all of which have been removed from time to time.

The defendants in error acquired the property they own on Michigan avenue in 1887 and 1889, and the original bill in this cause was filed by them in 1890.  That the abutting property owners have been diligently striving to protect their rights in the park cannot be gainsaid by any one familiar with the litigation that has been carried on in relation thereto and with the repeated enunciations of the courts enforcing their rights.  That they have quietly assented to repeated violations of these rights is not borne out by the facts in the case.  Whether the city had the power to authorize the erection of the temporary buildings mentioned it is not necessary here to inquire, but we cannot agree with counsel for plaintiff in error that the defendants in error have waived all of their rights in the premises because they may have chosen to waive some of them.  The only permanent building, perhaps, that is excepted from the injunction is the Art Institute, and all the property owners gave their consent to its erection.

It cannot be said that the erection of the Art Institute has so impaired the benefits to be derived from Lake Park that thereby the whole easement is gone. The defend-·ants in error paid $40,000 more for their property because of its location on the park, and would be seriously damaged by the erection of large and high permanent buildings, such as the city hall building and others.

The decree is affirmed.                    *Decree affirmed.*